[Crim. No. 3988. Second Dist., Div. Three. Jan. 17, 1947.]

THE PEOPLE, Respondent, v. CHARLES W. CANNON, Appellant.

A. C. Ackerson for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

KINCAID, J. pro tem.—By indictment the grand jury of the county of Los Angeles accused defendant of the commission of seven counts of grand theft, a felony. Following a trial by the court, a jury trial having been waived, a judgment of guilty was rendered as to each count. A subsequent motion for a new trial was denied and the defendant was sentenced, counts II and III to run concurrently with the sentence as to count I, and counts V, VI and VII to run concurrently with the sentence as to count IV. The sentence as to the latter count was ordered to run consecutively with that as to count I. From the judgment and order denying defendant's motion for a new trial the defendant appeals.

It is urged that the evidence in this case is insufficient to sustain a conviction under any count of the indictment and that the trial court erred as a matter of law in arriving at such decision.

The evidence relied upon by the prosecution as being most favorable in support of the judgment is that Ralph Goeller, the complaining witness, became acquainted with defendant about 1933 while they were working in the same branch of a local bank. Defendant was the branch manager, studied law during that period and was admitted to practice in California. When Goeller's father died in 1938 he engaged defendant as his attorney to represent him in the matter of his father's estate. In connection with the probate of such estate and with his personal affairs Goeller, on September 27, 1939, signed an authorization card permitting defendant as his agent to enter his safe deposit box. When he visited Honolulu in 1940, defendant was furnished with a duplicate key to the box so that if needed defendant could clip coupons from the bonds therein or cash a bond if requested so to do and forward its proceeds. Defendant retained this key until January 30, 1945, when his authority to enter the box was

withdrawn. Defendant was never given permission to enter the box alone excepting when Goeller was out of town and then only by specific direction, and at no time did Goeller authorize defendant to go alone to the box and remove any bonds therefrom. Defendant was paid for his legal services rendered in behalf of the estate by cash and at no time received any bonds in payment of attorney's fees.

During the probate period defendant informed Goeller that, by way of fees for legal work, he had obtained control of Filters, Inc., a corporation which manufactured air filters, which company had great prospects but was short of funds. On several occasions he solicited Goeller to invest money in this company and although the latter refused to do so he agreed to lend defendant some bonds which he could use solely as collateral security for a personal indebtedness which defendant would incur in obtaining money for his own further investment in the company. Such bonds were never to be sold by defendant as they were all tax exempt municipal bonds which Goeller had inherited from his father. Defendant was further told that he was not to borrow so much money on the bonds as to cause them to be foreclosed and that he was to return them to Goeller when the company got "squared around." During the period that the bonds were being used as collateral security by the defendant, Goeller was to receive the income from the bond coupons but was not to receive any interest from defendant for the loan of the bonds, although the latter assured him that if the filter company made a profit he would benefit therefrom.

During the period between September, 1940, and December, 1942, Goeller loaned defendant bonds worth a total of $50,000 to be used only under the conditions above set forth. On each occasion when such bonds were delivered to defendant Goeller personally withdrew them from his safe deposit box, defendant sometimes being present. On such occasions defendant gave Goeller a signed receipt stating that such bonds were to be used as collateral security for his personal loans. During the period from September 5, 1940, to December 1, 1942, $24,000 of such bonds referred to in count VI of the indictment were deposited with a bank as collateral security for defendant's loans totaling $24,500. On December 30, 1942, without Goeller's knowledge or consent, defendant ordered the bank to sell such bonds and they were sold on the following day for $30,118.96. After payment of the moneys due the

bank for loans and interest the balance of the sales price of $5,230.97 was deposited to the credit of defendant in his personal bank account in such bank.

On June 24, 1942, defendant deposited with a bank as security for $6,000 in personal loans to him, bonds owned by Goeller of a par value of $5,000, which are referred to in count IV of the indictment. On August 26, 1942, without Goeller's knowledge or consent, defendant ordered the bank to sell such bonds. They were sold on or about that day from which sufficient moneys were received to pay off this loan, with interest, leaving a balance in excess of $624.41, which sum was delivered to defendant.

Between September 14, 1942, and October 31, 1942, defendant borrowed $20,000 from the bank as security for which he deposited $16,000 of Goeller's bonds, as referred to in count VII of the indictment. On January 14, 1943, without Goeller's knowledge or consent, defendant ordered the bank to sell such bonds, and $20,132.18 was received by their sale. After the loan and interest was repaid the bank the balance remaining from the sales price of $3,432.18 was deposited in defendant's personal bank account in such bank.

On December 22, 1942, defendant deposited with a bank $5,000 of such bonds as security for loans advanced to him totaling $6,000, referred to in count V of the indictment. On February 23, 1943, without Goeller's knowledge or consent, defendant ordered the bank to sell such bonds. They were sold on the following day for $6,515.60, and after deducting the amount of the loans, with interest, the remaining balance of $562.89 was deposited to defendant's credit in his personal bank account in such bank.

On October 30, 1942, defendant gave Goeller a consolidated receipt covering all bonds delivered to him to that date, which receipt specified that they "are to be used as collateral to my personal indebtedness." On June 14, 1943, defendant sent Goeller a letter advising him that because of reasons concerning his health it would be necessary for him to leave town for a while. He expressed appreciation of the assistance which Goeller had given him and his efforts to build up the filter company, and in order to secure him for his financial help he, by such letter, transferred, assigned and set over to Goeller all his right, title and interest in and to the filter company stock which had been issued to him, amounting to 89 per cent of the outstanding stock. He further stated that he would

endorse the stock certificates and give notice of assignment to the secretary of the company. He requested the signature of Goeller to a copy of the letter, including an irrevocable proxy, coupled with an interest to defendant, whereby the latter was to have full control and discretion as to the manner in which the stock was to be thereafter voted. The copy of the letter was signed and returned by Goeller, the notation as to the assignment of the stock interest was made by defendant on the books of the company but the certificates themselves were never delivered to Goeller.

About April 7, 1944, Goeller returned from a trip out of the state. He was ill and his doctor advised him that he must go to bed. He then went to his safe deposit box, entered it with his own key, checked all of the 42 $1,000 bonds which remained therein and clipped the coupons therefrom payable to October 1, 1944. He thereupon went to bed and remained there for some days thereafter. A day or two after April 7, 1944, defendant called upon Goeller at his home and visited him in his bedroom. Goeller's key to his safe deposit box was in a dresser drawer in this bedroom but such key was not given to defendant. Goeller told defendant that he would not lend him any more bonds as he had over half of them.

On April 10, 1944, defendant entered Goeller's safe deposit box and took therefrom $12,000 in bonds and deposited them in a bank as collateral security for a personal loan to him. On April 14th, defendant again entered such box, removing $6,000 in bonds therefrom, which were posted as security for another loan by the same bank, the total of the two loans being $20,000. These bonds are referred to in count I of the indictment. On May 18, 1944, defendant ordered the bank to sell such bonds and $20,781.68 was realized therefrom. After deducting the amount of the loans and interest a balance remaining from such sale price of $674.51 was deposited to defendant's personal account in such bank.

On April 17, 1944, Goeller asked his wife to go to his safe deposit box and get the certificate to an automobile which he desired to sell. They searched for their key to the box and found it to be missing. Mrs. Goeller telephoned defendant for the purpose of borrowing the other key which was in his possession. Defendant met her and gave her a key, telling her to tell Goeller not to change the box because the other key might be found. Defendant had both keys to the box in his possession at this time but did not so advise Mrs. Goeller, and

her husband believed that the one which he received from defendant and retained was the only key then in the latter's possession.

On July 18, 1944, defendant again entered Goeller's safe deposit box and removed $7,000 in bonds which are described in count II of the indictment. On the same day defendant deposited such bonds with a bank with instructions to sell the same. They were sold on the following day for $8,433, all of which was deposited in a new bank account opened by defendant with such bank.

On September 15, 1944, defendant again entered such box removing $3,000 in bonds, which are referred to in count III of the indictment. On the following day these bonds were deposited as collateral security for loans made by a bank to defendant in the sum of $3,100. Defendant thereupon got married and left the city on a honeymoon.

On October 5, 1944, Goeller sent his wife to the safe deposit box, which was the first visit either of them had made to the box since April 17, 1944. Only 14 bonds remained in the box. Goeller attempted to contact defendant but found him to be out of the city by reason of his marriage, and upon the latter's return on October 10, 1944, he called upon Goeller. In response to the question as to what had happened to the bonds which had been taken from the box since April 7, 1944, defendant said he had taken such bonds because the company had another big order for filters and he needed the money right away, and as he had noticed that Goeller had clipped the coupons up to October he thought he could use the bonds and put them back in the box before Goeller went to get them on October 1, 1944.

On January 21, 1945, Goeller prepared a written receipt for the 28 bonds which were missing from the box and defendant signed it with the notation "the above bonds are held by the undersigned as collateral to loans of Filters, Inc., and are in addition to other bonds on which receipts have been previously given. C. W. Cannon." The bonds described in counts I, II and III of the indictment made up the itemized list in such receipt. Goeller then asked defendant if it were not possible that some of the bonds had been sold or that a bank had collected by foreclosure on them and defendant denied any such sale or foreclosure, stating that they were all held by one bank as collateral on notes.

Goeller then employed an attorney to investigate defendant's dealings concerning such bonds. On January 25, 1945, defendant told such attorney that he would furnish a financial statement of the assets and liabilities of the filter company. Defendant was then asked if he had sold any of the Goeller bonds and he replied that he had. When asked how many of such bonds had been sold defendant stated that he would have to examine his records in order to give a complete report. A full statement as to which bonds were sold, to whom, and the amount received, was demanded. Two days later defendant called at the attorney's office and failed to present a statement covering the sale of the bonds, but in response to a question then stated that all of the bonds had been sold. Only a meager handwritten financial statement as to the affairs of the filter company was ever delivered by defendant. On March 7, 1945, after repeated demands, defendant delivered to such attorney a statement covering the sale of the Goeller bonds.

For those bonds covered by counts IV to VII, inclusive, of the indictment, defendant, over all of the period from the time of receiving such bonds to January of 1945, continued to pay Goeller a sum equivalent to the interest coupons maturing on such bonds. During this period two or three of such bonds matured and defendant paid Goeller the principal amounts thereof. None of Goeller's bonds were ever foreclosed upon by any creditor holding them as security for loans to defendant, nor has Goeller ever received a return of any of such bonds or the value thereof, other than those few which matured during the interval.

During the entire period of these transactions defendant told Goeller the filter company was making money and was growing so fast that it took all of the money the company got from its contracts to buy material for the next contracts. He also told Goeller of many deals which were pending to sell the company for a profit, but none ever materialized. Defendant testified that the filter company had lost money in the years 1940-1943, inclusive, and had made a book profit only in 1944.

The defendant urges on this appeal that the testimony of the complaining witness, Ralph Goeller, was unbelievable and inherently improbable and that certain elements essential to the commission of the crimes charged were here lacking. He readily concedes that the evidence presented by the record herein is highly conflicting in many instances but insists that

the judgment should be reversed on all counts upon the ground that Goeller's testimony relating to the circumstances under which he claimed the thefts were committed is so inherently improbable as to show he is unworthy of belief. This contention cannot be sustained. "Unless the appellate court can say that the testimony is so obviously and inherently improbable as to leave the court no recourse without self-stultification, except to reverse the judgment, the reviewing court should not interfere with the verdict and the judgment of the trial court upon that ground. (*People* v. *Antunez,* 28 Cal.App. 740 [153 P. 963] ; *People* v. *Becker,* 140 Cal.App. 162 [35 P.2d 196].) Such improbability must 'plainly appear before the reviewing court should assume the functions of the trial jury.' (*People* v. *Antunez, supra.*) 'Contradictions and inconsistencies in the testimony of a witness alone will not constitute inherent improbability' (*People* v. *Amadio,* 25 Cal.App. 729 [145 P. 151]), and 'it is not sufficient that the testimony may disclose circumstances which are unusual.' (*People* v. *Collier,* 111 Cal.App. 215, 226 [295 P. 898].)'' (*People* v. *Moreno* (1938), 26 Cal.App.2d 334, 336 [79 P.2d 390]. See, also, *People* v. *Johnson* (1941), 46 Cal.App.2d 63, 66 [115 P.2d 605] ; *People* v. *Santora* (1942), 51 Cal.App.2d 707, 711 [125 P.2d 606].) Applying these rules to the instant case we are unable to agree with defendant that Goeller's testimony is so inherently improbable as to require an interference with the judgment of the trial court upon that ground.

Without attempting to cover all of the evidence conflicting with that heretofore related, defendant particularly relies upon testimony which he claims shows that all moneys derived by him from the use of the bonds as collateral or from their ultimate sale was turned over to and used by Filters, Inc., that Goeller had full knowledge of the operations and financial condition of such company at all of the times in question; that under date of January 2, 1943, defendant by letter advised Goeller of the sale of the bonds described in counts IV, V, VI and VII; that Goeller knew defendant was personally paying a substantial income tax for him for the year 1943, thus showing knowledge of and authorization to sell the bonds which gave rise to the increased income thus accounted for; that the bonds were borrowed for a legal purpose and used exactly as proposed and therefore no fiduciary relationship was violated by defendant. All of the evidence as to these matters was

either directly or indirectly refuted by prosecution testimony which the trial judge was entitled to weigh and determine. Even where the probative facts are undisputed the question as to the inferences to be drawn therefrom is still within the exclusive province of the trial court, it being as much the function of such court to resolve a conflict between opposing inferences as it is to resolve a conflict between contradictory statements of fact, and such a determination, if supported by any substantial evidence, is binding on appeal. (*Tobola* v *Wholey* (1946), 75 Cal.App.2d 351, 355 [170 P.2d 952]; *Mah See* v. *North Amer. Acc. Ins. Co.* (1923), 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123].) ''Questions as to the credibility of witnesses and the weight to be given their testimony are for the trier of the facts. As said in *Turner* v. *Whittel*, 2 Cal.App.2d 585, 588 [38 P.2d 835] : '. . . Although impeaching evidence in the nature of contradictions or otherwise has been received, it is still the right as well as the duty of the jury to determine to what extent they believe or disbelieve the testimony. (*Estate of Gird,* 157 Cal. 534 [108 P. 499, 137 Am.St.Rep. 131]; *Secondo* v. *Secondo,* 218 Cal. 453 [23 P.2d 752].) They may likewise give credence to a witness who has falsely testified in part (*Robinson* v. *Robinson,* 159 Cal. 203 [113 P. 155]), or whose testimony contains contradictions or inconsistencies. (*Bitsekas* v. *Parechanian,* 67 Cal.App. 148 [266 P. 974].) An appellate court is not concerned with the question of the preponderance of the evidence but with the single inquiry whether the record contains substantial evidence tending to support the findings assailed. (*Hotaling* v. *Hotaling,* 187 Cal. 695 [203 P. 745]; *Johnson* v. *Risdon,* 89 Cal.App. 768 [265 P. 505].)' '' (*Hansen* v. *Bear Film Co. Inc.* (1946), 28 Cal.2d 154, 184 [168 P.2d 946].) The evidence herein, when believed by the trial judge, is of sufficient substantiality to warrant a conviction, and under such circumstances an appellate court is precluded from reversing the judgment on the ground of its insufficiency.

With reference to defendant's contention that the evidence fails to establish certain elements material to the crime of grand theft, he directs our particular attention to a lack of proof of an intent to steal, of the agency relationship, of any fraudulent intent and any appropriation or conversion to defendant's own use.

Since the amendment in 1927 to section 484 of the Penal Code a defendant may be convicted of grand theft upon.

proof showing either larceny, embezzlement or obtaining money by false pretenses. (*People* v. *Cook* (1935), 10 Cal. App.2d 54, 57 [51 P.2d 169] ; *People* v. *Jones* (1943), 61 Cal. App.2d 608, 622 [143 P.2d 726].) Those offenses charged in the indictment under counts IV to VII, inclusive, fall under the classification of embezzlement, while those enumerated I to III, inclusive, must be considered in the category of larceny.

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted." (Pen. Code, § 503.) The essential elements of the crime of embezzlement are set forth in *People* v. *Borchers* (1926), 199 Cal. 52, 56 [247 P. 1084], as follows: "In order to sustain a conviction upon such a charge it must at least be shown, first, that the accused was the agent or bailee of the prosecuting witness in holding the alleged embezzled property; second, the property must actually belong to the alleged principal, the prosecuting witness; third, it must be lawfully in the possession of the accused at the time of the alleged embezzlement; fourth, the accused must have been guilty of the conversion which the statute denounces; and fifth, there must be shown an intent on the part of the accused to deprive the prosecuting witness of his property unlawfully. (See 20 C.J. 413 and following pages.)" As to the first required element concerning the defendant being the agent or bailee of Goeller in holding the bonds in question, Penal Code, section 507, provides: "Every person entrusted with any property as bailee . . . or with any power of attorney for the sale or transfer thereof, who fraudulently converts the same or the proceeds thereof to his own use or secretes it or them with a fraudulent intent to convert to his own use, is guilty of embezzlement." A loan for use is defined by section 1884, Civil Code, as "a contract by which one gives to another the temporary possession and use of personal property, and the latter agrees to return the same thing to him at a future time, without reward for its use." Section 1885 says: "A loan for use does not transfer the title to the thing; and all its increase during the period of the loan belongs to the lender." A loan for use is a bailment for the benefit of the bailee. (4 Cal.Jur. 9.).

Under evidence herein which the trial judge was entitled to believe, a bailor-bailee relationship was established as to the bonds described in counts IV to VII in that they were delivered by Goeller to defendant, his friend and attorney, for

the latter's use as collateral security for a personal indebtedness for a temporary period only until such time as Filters, Inc., got "squared around." Such bonds were to be returned to the owner at that time without any reward for their use and were never to be sold by defendant. The fact that the income from the bond coupons, as well as the principal of those bonds falling due, was reserved by and paid to Goeller, is further evidence that title to such bonds never left him and the transactions between them constituted bailments for use rather than sales. (See *People* v. *Baker* (1923), 64 Cal.App. 336, 342 [221 P. 654]; *People* v. *Harby* (1942), 51 Cal.App.2d 759, 771 [125 P.2d 874].)

Defendant contends that the record fails to disclose ownership in Goeller of the bonds which he is charged with embezzling in that, by delivering these bearer bonds to him title must have passed as this was necessary in order that he might post them as his own for collateral security. While the banks with which defendant dealt in posting and selling these bonds might readily raise this estoppel against Goeller, defendant, under the evidence herein, is in no position to question his principal's ownership. (*People* v. *Riordan* (1926), 79 Cal. App. 488, 493 [250 P. 190]; *People* v. *Stafford* (1927), 81 Cal.App. 159, 161 [253 P. 183].) As a contract of bailment for use the title to and ownership of the bonds so bailed to defendant remained vested in the bailor as against the bailee.

The third necessary requirement to the sustaining of an embezzlement conviction, that the property is lawfully in the possession of the accused at the time of the commission of such crime, is fully met by the evidence. Up to the time of the sale of such bonds by defendant, he had done with them exactly what he agreed with the owner to do. Although after the bonds were posted with the banks the defendant was not in actual physical possession of them, he still retained control over their disposition and therefore was in constructive possession. (*People* v. *Tambara* (1923), 192 Cal. 236, 240 [219 P. 745].)

The fourth element of embezzlement, that the accused must have been guilty of the unlawful conversion, is likewise fully established by the evidence. It is conceded by the defendant that he sold all of the bonds described in counts IV to VII. We are bound by the implied finding of the trial court that they were sold contrary to the express agreement with the owner that they were never to be sold but should be returned

to him at a future time. The court would have been justified in believing, from the evidence of successive sales, that when defendant borrowed the bonds, upon a promise to return them, he intended to sell them and to keep the sums that remained after his loans were paid off. Defendant contends, however, that the court is precluded from finding that he converted the property to his own use by reason of the fact that the proceeds of the sale thereof were used in furthering the operations of the filter company, an interest in which had been assigned to Goeller, and that as a consequence the bonds were used exactly as proposed. This argument is entirely refuted by the implied finding of the court that any sale whatsoever of the bonds was contrary to the authority given him by the owner. Furthermore, the trial judge may well have inferred, from the evidence showing substantial sums from the sale of such bonds to have been deposited in defendant's personal bank accounts, that all of the proceeds accruing from the sales did not find their way into the company in question but were otherwise used by the defendant. The motive with which the offense is committed is immaterial. (29 C.J.S. 688.) The money from the sale of the bonds was applied to the use of the defendant when he used it in the way he chose. Whether he elected to use it on his personal obligations or give it to the filter company he nevertheless directed its disposition and thereby applied it to his own use. (*State of Kansas* v. *Pratt* (1923), 114 Kan. 660 [220 P. 505, 34 A.L.R. 189].) From the evidence herein the trial court was justified in finding that defendant had appropriated such moneys for his own use and for purposes not in the due and lawful execution of his trust. (See *People* v. *Schroeder* (1919), 43 Cal.App. 623, 626 [185 P. 507].)

██ As to the fifth element, an intent on the part of the accused to unlawfully deprive the owner of his property, from all of the evidence, including that showing that the bonds in question were sold by defendant in 1942 and 1943; that he did not tell Goeller of such sales but in fact after at least part of such bonds had already been sold he gave him a written receipt showing them to be held by him for use as collateral for his personal indebtedness; he told Goeller in 1945 that none had been sold but all were being held in a bank as collateral security for his loans; that the proceeds of such sales were in fact used to pay off his own indebtednesses with the balance deposited in his personal bank accounts, the court was

justified in concluding that the defendant was actuated by such a fraudulent intent. See *People* v. *Larson* (1928), 92 Cal.App. 376, 384 [268 P. 419] ; *People* v. *Hill* (1934), 2 Cal. App.2d 141, 157 [37 P.2d 849].)

With reference to the larceny counts, I to III, the essential elements of that crime are:

1. A taking of the thing which is the subject of the crime from the possession of the owner into the possession of the thief, without the consent of the owner.

2. Asportation of the thing which is the subject matter of the offense.

3. The thing which is taken and carried away must be the property of another.

4. The taking and carrying away must be with an intent, without claim or pretense of right or justification, to deprive the owner of his property wholly and permanently. (*People* v. *Edwards* (1925), 72 Cal.App. 102, 112 to 116 [236 P. 944]; *People* v. *Williams* (1946), 73 Cal.App.2d 154, 157 [166 P.2d 63].) Each of these elements is fully substantiated by the evidence. Defendant's denials and assertions with reference to the circumstances under and by which he took, carried away, sold and used the proceeds from the sale of these bonds merely create a conflict in the evidence which the trial court has resolved against him. The trier of fact was entitled to disregard entirely the testimony of the defendant exculpating himself if he found it unworthy of belief. From the evidence herein the court was justified in resolving any conflict against the defendant and this court is bound by such implied finding on appeal.

We have considered defendant's claim that the trial court prejudicially erred in sustaining the objection of the prosecution to two questions propounded in defendant's behalf but find no merit therein.

The judgment and order denying defendant a new trial are affirmed.

Shinn, Acting P. J., and Wood, J., concurred.

A petition for a rehearing was denied January 29, 1947.