[Crim. No. 4557.   Second Dist., Div.. One.   June 12, 1951.]

THE PEOPLE, Respondent, v. PAUL G. MOORHEAD et al., Appellants.

Youngdahl & Glick and Peter J. Youngdahl for Appellants.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

DRAPEAU, J.—In an information containing 21 counts, defendants were jointly charged with the crime of grand theft. Counts one and fifteen were dismissed. The jury found defendant Moorhead guilty, and defendant Downey not guilty, as to count two. Verdicts were returned finding both defendants guilty as charged in the remaining counts. Defendants' applications for probation and their motions for new trial were denied.

From the ensuing judgments of conviction, from the verdicts of the jury and from the orders denying their motions for new trial, defendants appeal.

Count one charged grand theft of $5,000 from Wilshire Escrow Company and Eric and Ida C. Flodine on February 13, 1948; count two, grand theft of $550 from defendants' corporation, Safeway Homes, Ltd., on February 2, 1948; all other counts charged grand theft of sums of money from various individuals.

The following points are urged on this appeal:

(1) The verdicts are contrary to the law and the evidence.

(2) The court erred (a) in its rulings on the admission of evidence; (b) in the giving of certain instructions; and (c) in refusing to grant the motions for new trial.

Appellants Moorhead and Downey, as president and vice-president, respectively, of Safeway Homes, Ltd., a corporation, purchased a tract of unsubdivided land in Redondo Beach in the fall of 1947. They assumed a trust deed for $99,100 in favor of Eric and Ida C. Flodine, the original owners of the land. This document provided for release of individual lots from the lien thereof upon payment of $700. No payments were ever made on the trust deed nor under the release clause, Mr. Flodine testifying at the trial that he foreclosed the trust deed in March of 1949.

Appellants proceeded with the preliminary grading and improvement of the land, and employed a draftsman to make drawings of prospective dwellings to be erected in the tract.

The map of the new subdivision, known as tract number 11336, was conditionally approved by the city council of Redondo Beach on December 15, 1947. The bonds required by

a city ordinance, i. e., one for $110,000 guaranteeing completion of the improvement, and the other for $55,000 securing against the filing of mechanics' liens, were posted on February 5, 1948. Final approval of the subdivision map was declared as of that date and the map was duly recorded.

Although these bonds were approved by the city attorney as to form, and by the mayor as to sufficiency, some objection was later raised to them, with the result that appellant Moorhead substituted another set of bonds for the same amounts on April 15, 1948. The original bonds were returned to Mr. Moorhead. The substituted bonds show approval by the city attorney as to form, and the mayor as to sufficiency on April 15, and 17, 1948, respectively.

Apparently, the bonds were worthless. An investigator for the State Department of Insurance testified at the trial that there was no record that the company which purportedly executed them was ever admitted to do business in the State of California.

After the preliminary grading and leveling was done late in 1947, no streets, sidewalks, curbs or sewers were ever installed, and no houses were built.

In the meantime, appellants employed Mr. J. W. Davis as their sales agent and put on a sales campaign. The tract was signed for sale, and a majority of the prosecuting witnesses testified that they noticed the posters as they drove by. They then talked with Mr. Davis at the tract office where a map of the property hung on the wall.

The record herein discloses that after a prospective buyer looked at the property he chose a particular lot which was noted on the wall map. He examined blueprints and drawings and selected the type of house he wanted built on the lot. He then signed a so-called "Request for Reservation" indicating the house and lot of his choice and made a deposit, the amount of which depended upon whether he was a veteran or nonveteran. In such request the buyer agreed to execute a contract for delivery to him of the lot he had chosen improved with the house of his choice for a total price ranging from $7,950 to $8,950, together with payment of the balance of the down payment.

The second contract was denominated a "Building Contract" and provided that the contractor would obtain the necessary building loans to complete the purchase of the lot and the construction of the house, such loans to be amortized building loans, F. H. A. or G. I. insured loans. It also pro-

vided for refund of deposits if buyer's credit was not approved; that 30 days would be required to complete and record the building loan and that the time for completion and delivery of the proposed residence should be approximately 90 working days from date of recording the loan.

Count two upon which appellant Moorhead was found guilty is based on a transaction with Mr. W. M. Goleman, a sheet metal contractor, who testified at the trial. He made an agreement in January of 1948 with appellant Moorhead in behalf of Safeway Homes, Ltd., to furnish sheet metal for 141 proposed dwellings in Tract Number 11336. In order to insure preferred service and have the required material available for the work, Safeway Homes advanced to Mr. Goleman the sum of $1,000, which was to be returned in the event the "project does not proceed." A portion of this money was used to purchase such material. Sometime in February of 1948, the agreement was cancelled by mutual consent, and by endorsement across the face thereof, appellant Moorhead acknowledged receipt of the $1,000 theretofore advanced. On February 14, 1948, Mr. Goleman refunded $550 in cash of the $1,000 advanced by delivering the same to Mr. John Davis, the salesmanager. Later Mr. Moorhead advised Mr. Goleman that he had received the $550.

It was further testified that the account books of Safeway Homes showed issuance of a check in favor of Mr. Goleman on January 30, 1948, for $1,000, but no recorded record of the refund was found.

The following résumé is typical of the testimony given at the trial by the various prosecuting witnesses named in counts three to fourteen, and sixteen to twenty-one:

Mr. Roy H. Morris testified that he was employed by T. W. A. airlines and saw an ad in the paper about Safeway Homes; that this tract was near his work, so on March 21, 1948, he and his wife drove over, stopped at the tract office and talked to appellant Moorhead. They selected a lot and picked out a house plan; signed a "Request for Reservation" and made a deposit of $100.

Mr. Moorhead told them that they "would have to pay $100.00 down; it was a highly restricted area; and that it would be approximately two weeks before he would know whether or not I would be accepted"; that the $100 would be refunded if the application for the G. I. loan was not approved; and that "the house would be completed within not over 90 days after I paid the hundred dollars." At this

time, the witness and his wife drove around the tract and noticed that graders had gone through and marked out the streets, but "that was all."

Shortly thereafter, the witness was notified by Mr. Davis that his G. I. loan had been approved and on March 28, 1948, he and his wife signed the "Building Contract." The total price of the house and lot was recited therein as $7,950. They then paid the balance of the down payment, to wit: $400. The remainder of the purchase price was to be paid under the G. I. or F. H. A. or a combination thereof, at $49 and some odd cents per month.

No improvements were ever placed on the property, the witness never received a deed to the lot and no house was ever built.

After some months of waiting, the witness requested a refund of his down payment of $500 from appellant Moorhead, who told him that "he was having quite a hard time, that he had mortgaged his car to refund some money to one of the purchasers, and that if he could have a little more time, why, he was sure that everything would come out all right. . . . I tried to get him to commit himself as to how long it would be before I would receive a refund, and he said, 'Well, maybe a week, two weeks, or three weeks,' and I said, 'Well, can you give me any more definite date?' and he would not." However, appellant Moorhead gave the witness "a form to request my refund," which was signed and returned to appellant on December 8, 1948. No refund was ever made.

A majority of the prosecuting witnesses dealt with Mr. Davis, the salesmanager; some of them talked to appellant Moorhead and a few saw appellant Downey at the company's tract office.

Mr. Davis testified that he worked for Safeway Homes from November of 1947 until October, 1948; and first discussed employment with appellants in November of 1947; that appellant Moorhead was president of the corporation, and appellant Downey was in charge of sales promotion; that they offered the witness "a commission on the basis of about $100 a house, per sale"; that the lots would be sold on a reservation basis, i.e., to build a house on a certain lot in the tract. He received instructions from both appellants and was paid about $4,800 during the time he was employed, part of which he paid to two salesmen who were working under his supervision. In January of 1948, appellants told him that a loan

company had consented to make a loan, and they instructed him to tell prospective buyers that "as soon as the F. H. A. could complete their processing of the application and then mortgages would be filed and recorded and the work would start very shortly thereafter." Also, "If the individual found it impossible to wait any further or any longer for their houses to be built, that they could sign a request for cancellation and I would take that into the office. . . . That they could have their refund." He received about 20 requests for such refunds. The witness further stated that the work of grading and preparing the tract for streets and the grading and leveling of lots went on for about 30 days and terminated in December of 1947; that no streets, sidewalks, curbs or sewers were ever constructed and no houses were ever built.

With respect to count two, Mr. Davis testified that Mr. Goleman gave him $550 in cash which he handed to appellant Moorhead at the tract office.

On cross-examination, Mr. Davis testified that the Federal Housing Authority did not give its final commitment on the tract until June, 1948. By that time the loan company which had previously consented to a loan had withdrawn its commitment. Negotiations continued with other loan companies, but no loan was ever completed. The witness took deposits from prospective purchasers until October of 1948.

Mr. Thomas B. Doherty, an accountant in the district attorney's office, testified that he examined the books of Safeway Homes, Ltd., and from the items therein he made the following recapitulation: Total amount received from depositors was $62,708; refunds were made in the amount of $9,783; expenses were $33,320.16; leaving a balance of $19,604.84, which was unaccounted for. He further testified that he found no record of any bond premium being paid; that he found that a check was issued to Mr. Goleman on January 30, 1948, for $1,000, but he found no record of a refund of any part of such $1,000.

Appellant Moorhead took the stand and testified in detail as to the difficulties encountered in financing the tract in question; that F. H. A. gave its commitment around June 10, 1948, but Syndicate Mortgage did not follow through because their financing period of 90 days expired before the F. H. A. commitment came through; that he then went to Occidental Savings and Loan Association; recontacted Syndicate Mortgage and contacted several other loan associations. During this period considerable dissatisfaction was registered by the

buyers, and, because of the indefinite attitude among the lending institutions, it was attempted to finance the project through private sources. This failed also, because Mr. Flodine started to foreclose the trust deed in November, 1948.

On cross-examination, Mr. Moorhead testified that he approved most of the disbursements made by the corporation; that he and appellant Downey were president and vice-president, respectively, of the corporation, and that they had a drawing and expense account during the year 1948 which was around $5,000 each.

Appellants argue that "there is no substantial evidence to support the implied finding of guilt"; that "every bit of the testimony indicates an honest intent to carry on" in the face of "unforseen disaster"; hence "an essential element to conviction is entirely missing, regardless of whether these appellants were convicted upon the theory of false pretense or the theory of embezzlement."

"Defendant's contention of insufficiency of the evidence to support the counts of the information are answered if a theory of theft which will meet the test of reasonable doubt may be drawn from the evidence.

"Penal Code, section 484, now amalgamates the crimes of larceny, embezzlement, false pretenses, and kindred crimes under the cognomen of theft. (*People* v. *Myers,* 206 Cal. 480 [275 P. 219]; *People* v. *Cannon,* 77 Cal.App.2d 678 [176 P.2d 409].) Like charity, California's definition covers a multitude of sins. No longer need the legal profession puzzle over the distinctions between embezzlement, larceny and other elements of stealing. The crime is complete if a man takes property not his own, with intent to take it.

"This section of the Penal Code makes it a crime for any person 'by any false or fraudulent representation or pretense' to 'defraud any other person', and 'to fraudulently appropriate property which has been entrusted to him.' " *People* v. *Hiden,* 102 Cal.App.2d 655, 658 [228 P.2d 95].

As to count two, the evidence that appellant Moorhead received the $550 from Mr. Goleman and made no account of its receipt on the books of the corporation, was amply sufficient to support the jury's verdict on that count.

The evidence on the remaining counts discloses that appellants unsuccessfully attempted to finance their project. And they kept promising the prosecuting witnesses that their houses would be built relatively soon or they could have a refund of their down payments, some of which were paid.

Nonetheless, as the trial court appropriately observed, when passing on the motions for new trial:

"I have no doubt that this was a reckless enterprise, if in the first instance there was not a planned, predisposed idea of taking money of other people without giving value received.

"It wasn't very long until the situation developing as it did, the defendants well knew that they were taking money for which they could not possibly give value in return. . . . Of course, there are plenty of building projects around this area which have resulted in great successes to those who promoted them and resulted in their making a lot of money. Here this project might have developed into something successful, but the fact is that, being in extreme difficulties and being unable to carry out their promises, the defendants did not so inform those who paid the money, but kept on taking money of other people when they should well have known that their chances of furnishing anything in return for that money were very remote."

The evidence in this case establishes theft in the form of embezzlement, i.e., "the fraudulent appropriation of property by a person to whom it has been entrusted." (Pen. Code, § 503.)

Appellants contend that the admission in evidence of the substituted set of indemnity bonds constituted prejudicial error, because such evidence was incompetent to prove an intent on their part to defraud the prospective purchasers.

As hereinbefore noted, before approval of the subdivision map by the city council it was necessary that the indemnity bonds be on file. By reason of this fact, the bonds played an important part in appellants' project. In overruling appellants' objection to their introduction in evidence, the court gave as his reason for so doing: "It shows the manner of operation. It may go to the motive, it may go to the intent; it may go to the state of mind; it may shed light on whether the transaction was simply an innocent business transaction which eventuated unfortunately, or whether through a scheme this was a fraudulent factor."

It is well established that evidence of other acts of a similar nature may be admitted in criminal cases, to prove a material fact or where they tend to show motive, scheme, plan or system. See *People* v. *Henderson*, 79 Cal.App.2d 94, 119 [179 P.2d 406], and authorities there cited.

The admission of this evidence was not of such a

prejudicial character as to warrant a reversal of the judgments.

Appellants next contend that the court erred in giving two instructions: one suggesting a condition not warranted by the evidence, and the other defining a crime other than that with which appellants were charged.

■ The first instruction was: "If you find from the evidence that the moneys deposited with the Safeway Homes, Ltd. were to be used for a particular purpose, and you further find that said moneys were to be refunded if certain conditions were not met, that is, the obtaining of Veterans' or F. H. A. loans, and that such loans were not obtained, then said deposits constituted trust funds and were refundable to the persons so making such deposits and such deposits could not be diverted or used for other purposes without the consent of such persons so making the deposits. . . ."

The language complained of was an abstract statement of fact and not objectionable. See *People* v. *Flannelly,* 128 Cal. 83 [60 P. 670] ; 8 Cal.Jur. 298.

■ The second instruction reads:

"It is unlawful for any person to offer to sell, to contract to sell, or to sell any subdivision or any part thereof until a final map or record of survey map thereof, in full compliance with the provisions of state law and any local ordinance, has been duly recorded or filed in the Office of the Recorder of the county in which any portion of the subdivision is located."

While it is true that appellants were not charged with any violation of the Real Estate Act, this instruction is worded in the language of section 11538, Business and Professions Code, which is applicable to subdividers generally including appellants.

This case was fully and fairly tried. The evidence supports the judgments of conviction, hence the denial of the motions for new trial was not erroneous.

The appeals from the verdicts of the jury are dismissed. The judgments of conviction and the orders denying the motions for new trial are affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied June 25, 1951.