[Crim. No. 7270. Second Dist., Div. One. Aug. 14, 1961.]

THE PEOPLE, Respondent, v. GEORGE DIMITROVICH
et al., Appellants.

Jerome Weber for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Appellants.

FOURT, J.—This is an appeal from a judgment wherein the defendants were convicted of several counts of grand theft.

In an information filed in Los Angeles County the defendants were jointly charged in count one with a violation of section 182, subdivision 1 and subdivision 4 of the Penal Code (conspiracy to commit grand theft). In Counts II, III, IV and V they were jointly charged with violations of the provisions of section 487, subdivision 1, Penal Code (grand theft).

The defendants pleaded not guilty. A trial was had before a jury and each defendant was represented by separate counsel and after several days of trial both defendants were found not guilty as to Count I and each defendant was found guilty as to each of the remaining counts.

Dimitrovich and Kassab were active in a California corporation called Europa Travels, Inc., which was engaged in the business of providing low-cost air transportation from the United States to Europe and return. Kassab was president of the corporation. Starting in March 1959, advertisements were placed in local newspapers wherein it was announced in effect that round-trip air transportation from Los Angeles to Europe was available for $545, the flights to originate from Tijuana, Mexico and that an air shuttle service to and from Tijuana would be furnished without charge.

Stanley Wells, a U.C.L.A. student organized a group of students and others seeking transportation to Europe during the summer of 1959 and collected $40,000 from them on account of the cost of the air passage. Upon seeing Europa's advertisement on May 25 Wells mentioned the advertisement to Michael Otero, a travel agent who had operated the Charlemagne International Agency since 1955 and who arranged trips for teachers and students under the business title of Richelieu Institute. In a telephone conversation between Wells, Otero and Dimitrovich it was orally agreed that Europa would provide the chartered air transportation for the Wells group for $40,000, the trip to start on or about June 26, 1959. A total of $30,000 was paid to Kassab and Dimitrovich. On

May 28, Wells gave a $4,000 check to Otero who then gave Dimitrovich a $4,000 check drawn on the account of the Richelieu Institute. On June 2 Wells gave a $6,000 check to Otero who then gave Dimitrovich Richelieu's check in the same amount. On June 5 Wells gave Otero a $5,000 cashier's check which Otero endorsed to Europa. On June 12 Wells gave Otero a check for $15,000 and Otero gave Kassab a check of Richelieu's in the same amount.

The transportation was never furnished. None of the $30,000 was returned either to Otero or Wells. Kassab claimed that refunds were made to three of the students who had paid Wells. The prosecution by its witnesses established that the appellants were guilty of theft.

A résumé of some of the testimony of some of the witnesses is as follows: Otero stated that Wells was referred to him in 1959 by Transoceanic Air Lines to arrange transportation from Los Angeles to New York in connection with a proposed charter flight from Los Angeles to London and return. Wells showed him the advertisement[1] of Europa in the Los Angeles Times of May 10th.

Other advertisements of similar character were introduced into evidence. Wells called Dimitrovich and asked what Europa would charge to transport a group of about 100 passengers from Los Angeles to Paris as advertised in the Times. Dimitrovich stated that the charge would be about $50,000 to $55,000. The next day there was another talk between Dimitrovich and Otero and Dimitrovich told Otero that the passengers would be shuttled from Los Angeles to Tijuana in a plane provided by C.M.A., a Mexican airline and from there the group would board a plane provided for them to Paris. Otero informed Wells of Europa's offer and Wells stated that he had already talked to Dimitrovich who had quoted a price of $37,400. Wells and Otero then called Dimitrovich and after a discussion a figure of $40,000 was agreed upon. Otero was to be paid a $1,400 commission from Europa.

---

[1] "Now . . . Fly Los Angeles to Europe and Return for only $545.00 (Roundtrip) Complete Price . . . No Hidden Extras! Plush 'Parisienne' Flights Include service aboard luxurious DC 6-B's . . . pressurized and Radar-equipped. Two Stewardesses to serve you delightful French Cuisine. Vintage wines . . . complete bar and snack service. Flights emanate from Tijuana, Mexico. Air shuttle service from Los Angeles to Tijuana without charge. For Information and Reservations . . . Call ST 8-6200 Complete Tour Service Available also . . . Air Service to Great Britain • Norway • Sweden • Holland • Belgium • West Germany Italy • Egypt and Israel EUROPA TRAVELS Authorized Agents for: Aerolineas Mexicanos 16212 Ventura Boulevard Encino, California."

In a later conversation Dimitrovich asked Otero for a deposit on account of the $40,000 and Wells gave Otero a check for $4,000 and Otero gave Richelieu's check for $4,000 dated May 28, 1959, to Dimitrovich who requested that it be made to him for ease of negotiation. The check was deposited to Europa's account in the California Bank. During the talk on May 28 Dimitrovich said that Europa would provide a Constellation plane and that the money would be used to secure it. Otero did not authorize the use of the money for any other purpose than to secure an airplane.

Pursuant to another request of Dimitrovich for a further deposit Wells gave Otero a check for $6,000 and Otero gave Dimitrovich Richelieu's check for $6,000 dated June 2. This check was made payable to Dimitrovich at his request. The money was to be used to secure a plane and Otero did not authorize its application for any other purpose.

Otero met Kassab on or about June 2. Kassab discussed the deposits, the transatlantic flight and the shuttle service to Tijuana. The prospective passengers were seeking details of the flight and appellants indicated that they would be given. Otero called the C.M.A. at the Los Angeles air terminal and ascertained that C.M.A. knew nothing of any arrangements for a shuttle flight to Tijuana. Otero called the Mexican Government Tourist Office and they knew nothing about the matter. Otero then called Dimitrovich. He stated that Europa would post a bond. Otero told Wells of his talk with C.M.A. and they then called the bank and ascertained that Europa's account was quite low and they further learned that Europa had no Dun and Bradstreet rating. It was recommended to Wells that he contact the bunco squad at the sheriff's office. Wells and Otero continued to deal with the appellants because there was nothing uncovered which clearly established that their operation was a swindle.

On June 5 Otero gave Dimitrovich, in Kassab's presence, Wells' cashier check for $5,000 which he endorsed to Europa's account. The money was to be used to procure an airplane. At this meeting the appellants gave to Otero about 85 exchange vouchers and Otero was told that the vouchers were to be issued to the passengers who would take them to the airport on the departure date and there obtain tickets. Specimens of the vouchers were introduced into evidence.

Between June 2 and June 12 Dimitrovich told Otero "We have got you a plane from New York." On June 10 a tele-

gram was sent to Wells by Europa which in effect stated that unless the balance of the money for the flight was remitted by midnight the wire would constitute a cancellation. Dimitrovich would not divulge the name of the carrier.

On June 12 Otero met appellant Kassab at a bank where Otero obtained the certification of a $15,000 check from Wells to Richelieu. Otero then gave Kassab Richelieu's check in the same amount, made payable to Kassab because Dimitrovich had stated that Kassab "put up some money." The check was given in reliance upon representation of appellants that the money would be used to procure an airplane.

It was established by bank officers that Kassab took Richelieu's check for $15,000 and purchased a cashier's check in the same amount and deposited it to the account of American Nile Corporation. The authorized signators of the latter account were Kassab and his wife.

Otero told the appellants that he had given the exchange vouchers to Wells for distribution to the passengers. Appellants were upset and told Wells to get the vouchers back saying that they were still trying to get "the plane off the ground in Mexico."

On June 15, two $5,000 checks were tendered to Dimitrovich who stated "Hold off." On June 19 Otero had a meeting with Dimitrovich, Kassab and Falconer (the latter their attorney), and induced by their promise that the $30,000 would be refunded to the students, he signed a document prepared by Falconer. In this document there was a statement to the effect that Europa would cancel the flight if $40,000 was not paid prior to June 12. Otera repudiated the latter statement with reference to any right of Europa to cancel.

In the latter part of June the appellants were in Mexico City and Otero talked to them by telephone. Dimitrovich stated that they were unable to get permission to take the plane off the ground and that the $30,000 would be returned.

Wells testified that Otero had authority to represent him and further stated that he talked to Dimitrovich in a telephone conversation wherein the latter agreed to a price of $40,000 for the charter flight. On another occasion Wells talked to Kassab in Otero's office at which time Kassab said in reply to a request for tickets "We will get you tickets." Wells stated that he understood that Dimitrovich and Kassab had transportation available. When the C.M.A. officers told him, Wells, that they thought it was a "con operation" Wells

became suspicious and contacted the police. None of the money paid to Dimitrovich and Kassab was returned to Wells.

Kenneth Scarce of the Los Angeles Police Department talked with Wells and conducted a cursory investigation of Europa. He told Wells that in his opinion no crime had been committed up to the time of his investigation.

Michael Gallagher testified that C.M.A. had no arrangements with Europa in May or June 1959 to shuttle passengers from Los Angeles to Mexico. He further wrote Kassab a letter wherein in effect he stated that it had come to the attention of C.M.A. that false and misleading statements were being made, that Europa "has no connection whatsoever with Mexicana de Aviacion" and Europa was directed to cease and desist from conveying in any way the idea that the two companies were associated with each other in any respect.

Roy Williams, a special agent of the Civil Aeronautics Board, examined the records of that board and found that no permit had been issued to Europa or the appellants, allowing them to engage in air charter transportation from Los Angeles to Paris and that there was no application for such a permit. Such a permit would be required of an American citizen furnishing such air transportation directly or indirectly from Los Angeles to Tijuana thence to Paris.

It is appellants' contention that the evidence was insufficient to establish their guilt of theft and that the information was defective in charging them with theft from all three of the named victims. Appellants seemingly assert that there was no evidence of theft from Wells because Wells had transferred possession of the $30,000 to Otero; that there was no evidence of theft from Europa because the money did not come into the hands of Dimitrovich or Kassab as Europa's property; and that there was no evidence of theft from Otero because there was nothing from which the jury could have inferred that appellants took money from Otero with the intent to defraud and nothing from which the jury could have inferred that they fraudulently misappropriated the money after acquiring it.

 There was evidence that the appellants were advised by their attorney not to advertise their charter service in the Los Angeles Times, because at the time of such advertisement they had not signed a contract with any airline; that they had not acquired the use of an airplane; that they had no contract for shuttle service to Tijuana from Los Angeles;

that they had no contract to provide transportation to Paris from Tijuana; and they had not acquired uplift rights in Mexico. When the appellants agreed in May to transport the Wells group they still had no uplift rights, no use of an airplane and no contract for transcontinental flights or for shuttle service. They falsely represented to Otero that C.M.A. would provide the shuttle service and falsely represented that they had an airplane available. They took $30,000 from Otero against the advice of their own attorney and against their attorney's advice, they did fail to set aside any part of the $30,000 to pay for the use of an airplane. They spent none of the $30,000 in acquiring a plane. More than one-half of the $6,000 check was used in making a personal loan and the remainder thereof was used to pay some of Europa's attorney's fees. The $15,000 check was diverted from the bank into a real estate corporation owned by Kassab. The contract which appellants ultimately signed in July with Aerolineas was subject to their securing uplift rights which had not been obtained. Neither the appellants nor Europa had $30,000 to return to the Wells' group. Furthermore, there was evidence that even after appellants were warned not to use the Mexican airline's name they did so to passengers; they pirated Air France's advertising brochure and indicated that they were bonded which was untrue. It is apparent that there was an abundance of evidence demonstrating bad faith on the part of appellants.

Theft is the felonious taking of property which belongs to another. (See Penal Code, § 484; *People* v. *Moorhead,* 104 Cal.App.2d 688 [232 P.2d 268].)

Section 484 of the Penal Code was amended in 1927 and since that time an accused may be convicted of grand theft upon proof of facts showing larceny, embezzlement or obtaining property by false pretenses. (*People* v. *Cannon,* 77 Cal.App.2d 678 [176 P.2d 409]; *People* v. *Corenevsky,* 124 Cal.App.2d 19 [267 P.2d 1048].)

One of the distinctions between larceny by trick or device and theft by false pretenses is that in the larceny by trick or device situation, the victim intends to transfer possession only, while in the theft by false pretenses he intends to transfer both possession and title. (*People* v. *Nor Woods,* 37 Cal.2d 584 [233 P.2d 897]; *People* v. *Ashley,* 42 Cal.2d 246 [267 P.2d 271].)

Otero was acting as the agent of Wells. Otero did not own

the $30,000. Any offense committed against Otero was against his possession of the money as he did not have title to it and any offense against Wells was committed against his ownership of the money as he did not have possession of it. ▉ Either ownership or possession is sufficient as against a wrongdoer. (*People* v. *Torp,* 40 Cal.App.2d 187, 191-193 [104 P.2d 542]; *People* v. *Price,* 46 Cal.App.2d 59, 61-62 [115 P.2d 225].)

▉ The elements of larceny by trick or device are: (1) a taking and transportation of property; (2) property must belong to another; (3) the taking and carrying away must be with the intent, without claim or pretense of right, to deprive the owner of his property wholly and permanently; (4) the intent must exist at the time of the taking. (*People* v. *Taylor,* 116 Cal.App.2d 802 [254 P.2d 179]; *People* v. *Bartges,* 126 Cal.App.2d 763 [273 P.2d 49].) ▉ The trick or device may consist of a misrepresentation of some existing or past fact or of a promise made without intent to perform. (*People* v. *Robinson,* 107 Cal.App. 211 [290 P. 470].)

▉ Here the appellants were guilty of four offenses of larceny by trick and device. The checks were made over for the purpose of providing air transportation for a group. No other use of the money was contemplated by those who put up the money—Wells or Otero. Neither of the appellants claimed to have been authorized to do anything else with the money. They could either have produced the plane or given back the money. They did neither. The money admittedly was not used for the purpose for which it was intended.

Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. (Pen. Code, § 503.) Agents, bailees and trustees may be guilty of the offense. (Pen. Code, §§ 506, 507, 508.) ▉ In *People* v. *Borchers,* 199 Cal. 52, 56 [247 P. 1084] the elements of the offense are set forth:

". . . In order to sustain a conviction upon such a charge it must at least be shown, first, that the accused was the agent or bailee of the prosecuting witness in holding the alleged embezzled property; second, the property must actually belong to the alleged principal, the prosecuting witness; third, it must be lawfully in the possession of the accused at the time of the alleged embezzlement; fourth, the accused must have been guilty of the conversion which the statute denounces; and fifth, there must be shown an intent on the part of the

accused to deprive the prosecuting witness of his property unlawfully.''

There is sufficient evidence in this record for the jury to have believed and found that the appellants were guilty of embezzlement. (See *People* v. *Pierce,* 110 Cal.App. 2d 598 [243 P.2d 585]; *People* v. *Glass,* 181 Cal.App.2d 549, 554 [5 Cal.Rptr. 289].)

In *People* v. *Ashley, supra,* 42 Cal.2d 246, 259 the court sets out the elements of the offense of obtaining property by false pretenses:

''To support a conviction of theft for obtaining property by false pretenses, it must be shown that the defendant made a false pretense or representation with intent to defraud the owner of his property, and that the owner was in fact defrauded. . . . The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause. [Citation.] If the conviction rests primarily on the testimony of a single witness that the false pretense was made, the making of the pretense must be corroborated. (Pen. Code, § 1110.)''

There is ample evidence in the record to sustain the view that appellants were guilty of theft from Wells by false pretenses.

In this case each defendant seems to blame the other for his predicament; in any event the evidence is clear that both are guilty. Each participated in various phases of the condemned activity.

Appellants also assert that the information was defective because it charged them with theft from Wells and Otero and Europa and that in fact only one of the named victims could have had possession of the checks at the time of the taking, hence the other should not have been named in the information. The appellants had notice of the offense with which they were charged. Under the 1927 amendment to section 484 of the Penal Code the prosecution need not plead the form of the theft. (Pen. Code, § 952; *People* v. *Fewkes,* 214 Cal. 142 [4 P.2d 538]; *People* v. *Nor Woods, supra,* 37 Cal.2d 584; *People* v. *Ashley, supra,* 42 Cal.2d 246.)

This case is not one wherein the appellants were misinformed and to their prejudice proceeded in a fashion which later turned out to be to their detriment. They had full in-

formation to the end that they could and did prepare an extensive defense. The jury, however, did not believe them.

The judgment as to each defendant is affirmed and the orders denying the motions for new trials are and each is affirmed.

Wood, P. J:, and Lillie, J., concurred.

A petition for a rehearing was denied September 6, 1961.