[Crim. No. 749.   Fourth Dist.   Apr. 30, 1951.]

THE PEOPLE, Respondent, v. JAMES O. RYAN, Appellant.

Henry W. Hache for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with attempted grand theft, and found guilty by a jury. His application for probation was granted but he appeals from an order denying his motion for a new trial.

The defendant is a chiropractor, and also a graduate laboratory technician. Pursuant to an arrangement with agents of the State Board of Health and the district attorney's office, a nurse called the defendant on the phone and asked him

to come to see her father who was suffering from a cancer and who had been told that he had only five or six months to live. The defendant asked where the cancer was located and was told it was in the stomach. The next day the defendant came to the home of a Mr. Read, who had the cancer, and was introduced to Mr. Read as the nurse's father and to an inspector for the Food and Drug Bureau as her brother-in-law. Neither man was, in fact, related to the nurse. An investigator for the district attorney's office, who was also in the house, took down the conversations in shorthand and on a wire recorder.

The defendant examined Mr. Read's eyes, using an instrument connected to an electric outlet, but made no other examination. He announced that Mr. Read had a cancer in the stomach which had spread into the kidneys or liver, and that he knew this because he saw it in the patient's eyes. He repeatedly and positively stated that he could cure this cancer. He told them that his treatment consisted of a salve to be applied externally; that the treatment was not recognized by the American Medical Association; that this salve brought internal cancer to the surface; that the salve would be applied over the patient's abdomen and applied daily for a period of several months; that within a few days the salve would produce a running sore and would cause great pain; that the patient could either bear the pain or obtain opiates, if he was able to do so; that the running sore would create a foul odor, which was the cancer coming out; that Mr. Read would have 40 or 50 small holes in his stomach, through which the cancer would exude; that the exudation would gradually lessen; and that the salve should be applied as long as there was "one tiny hole." He told them that the salve for internal cancer was different from the one he used for external cancer. He showed them a jar of the salve he proposed to use and told them he made it from a secret formula which had been handed down to him by his grandfather, who had been a doctor in Texas; that the salve contained herbs, olive oil, wax and oil of croton; that it was impossible to analyze it chemically; that it contained three elements which were very necessary, and the best chemist in the world could not tell what they were; that the ingredients were very expensive; and that if the salve was applied as he had described the cancer would be drawn out and the patient would be cured. He told them that he had successfully treated internal cancers on other

patients, and claimed successes in treating both external and internal cancers. He left a small jar of the salve which he said was enough for a week's treatment.

The question of his fee was discussed. The defendant said that if he made daily visits to change dressings the cost for the entire treatment would be $1,000, but if someone else changed the dressings and he was required to come out but once a week the cost would be $500. The defendant at first suggested $200 down but, after a discussion, it was agreed that $300 would be paid down and the balance in sixty days. The $300 was paid, for which the defendant signed a receipt. It was arranged that the treatments were to start a couple of days later.

The defendant was arrested shortly after he left the house. A jar of this salve was taken from his bag. This jar and the small jar which the defendant had left at the house were analyzed by a chemist for the State Department of Public Health, who found that the substance consisted of lead oleate, rosin, sodium carbonate and some skin irritant or blistering substance. No evidence of any herb material was found. The defendant told the officers that this salve contained croton oil but refused to divulge its formula. He also said that he made the salve himself and put herbs into it; that the salve killed cancer regardless of whether it was internal or external cancer; that he inherited the formula from his grandfather who had practiced medicine in Texas; that the salve caused an eruption of the skin, which was part of the cure; and that in treating his previous patients he accepted without question the diagnosis of cancer which someone else had made.

Three licensed physicians and surgeons testified. An eye doctor testified that the presence of a cancerous growth in the liver, stomach or intestines could not be detected by any examination of the patient's eyes. The doctors testified that the salve, containing lead oleate and croton oil, could not penetrate through and reach an internal cancer; that croton oil is a severe irritant which will break the skin where it is applied; that lead oleate, if frequently applied, would cause lead poisoning; that this salve would have no beneficial effect in the treatment of cancer; and that before it could possibly reach the cancerous area it would destroy the live tissues in its path. In brief, the doctors testified that the use of this salve could have no beneficial effects in the treatment of an internal cancer, and that its continued use would result in very great harm to the patient.

The defendant testified that he made this salve by taking "Griswold's Salve" and adding croton oil and "Soap Lake Salts"; that among the larger portions contained in the salve was croton oil with "a greater proportion of oleate of lead"; that he had never had the salve analyzed; that the first time he used the salve he did not know what was in it, "but after I knew what it was"; that he first heard about the salve from one Galloway and talked with Mr. Barkus, a friend of Galloway's; that he had a knowledge of cancer and had studied forms of diagnosis; and that he had successfully treated 12 or 15 patients for cancer. There was evidence that he had treated no patient for internal cancer. He brought in several patients whom he said he had successfully treated. Portions of the tissue that had come from some of these patients, whom he had treated for external cancer, were brought into court. An analysis of these tissues was made and it was found that they contained no cancer cells, but only fat cells and pus cells resulting from an infection.

Evidence was received, without objection, concerning a patient who was suffering from an internal cancer and who was treated with this same salve six months before the defendant was arrested. The patient died shortly after the treatment and there was evidence that the salve caused her great injury and hastened her death. This salve had been obtained from Mr. Barkus, Mr. Galloway's friend, and the defendant had talked to them both about this cancer cure. The defendant testified that he had told people that he inherited the formula for this salve from his grandfather; that this was not true; and that he told this story because, in obtaining the formula from Galloway, he had agreed not to reveal what was in it.

The only point raised is that the court erred in denying defendant's motion for a new trial since the evidence is insufficient to prove that he made any false representations, for the purpose of defrauding, with knowledge of their falsity or under circumstances making him chargeable with such knowledge. It is argued that he honestly told these people that his method of treatment would not be approved by medical doctors; that there is no proof that he would have failed to cure Mr. Read had he been permitted to try; and that there is no evidence indicating that he had any reason to believe that his treatment would not cure such an internal cancer.

There is ample and compelling evidence that a number of the representations admittedly made by the defendant were false. Among these are the representations that his salve was composed of herbs; that his salve could not be analyzed chemically; that he inherited the formula for the salve from his grandfather who had been a medical doctor; that by looking at Mr. Read's eyes he could and did determine that Mr. Read had cancer of the stomach and intestines; that he had treated patients suffering from internal cancers; that he could cure internal cancer by applying his salve to the skin surface of the abdomen; and that the salve, so placed, would bring internal cancer to the surface.

The defendant contends that there is no evidence to indicate that he knew these representations were false because medical doctors admit that they know very little about cancer. It positively appears from the evidence that he did know that at least three of these representations were false. The evidence, with the reasonable inferences therefrom, is amply sufficient to show that he should have known that the rest of them were false. The representations that this salve was composed of herbs, that it could not be analyzed chemically, and that he inherited the formula from his grandfather who had been a medical doctor, were well designed to create the belief in the average layman that his salve was an ancient, secret and wonder remedy, and were apparently used for that purpose since no other reasonable purpose appears. The appellant was not only a licensed chiropractor but was a laboratory technician as well. He admittedly knew the ingredients of the salve he used, and he either knew or should have known their action and effect if frequently applied to the human body. He testified that he never questioned a diagnosis made by someone else, and that if a patient had been given up as incurable by the medical profession he had no hesitancy in prescribing his treatment. He argues that he was actuated solely by a desire to aid suffering humanity, in cases where medical doctors were unable to cure the patient. This is hardly consistent with the fee charged or with the collection of a large part of the fee in advance, when treatments were admittedly expected to extend over many months.

Proof of knowledge on the part of the defendant that some of the representations he made were false must necessarily rest on evidence with respect to the surrounding circumstances. The evidence here is sufficient to show that the defendant should have known that these representations were

false, and to indicate that he either knew them to be false or made them with a reckless disregard for their truth or falsity. The evidence supports the implied finding that the misrepresentations were wilfully made for the purpose of obtaining money from an unwary victim who would naturally be in a state of desperation.

In his opening brief the defendant, in setting forth a statement of the background of the case, makes the statement: "The story of Dr. Ryan's evolvement and entrapment in this case is comparable only to those related by the victims of the Russian Secret Police." The matter of entrapment is not amplified and no reference is made to anything in the record showing that the point was raised in the trial court. The record does show that it was not argued to the jury, and that it was not presented in arguing for a new trial. █ The defense of entrapment is one to be presented as a question of fact. (*People* v. *Bradford*, 84 Cal.App. 707 [258 P. 660]; *People* v. *Lee*, 9 Cal.App.2d 99 [48 P.2d 1003]; *People* v. *Grossman*, 28 Cal.App.2d 193 [82 P.2d 76].) Some of the elements of entrapment, under the authorities, appear to be absent here. █ On the record before us it cannot be said as a matter of law, that an entrapment here appears. (*People* v. *Lagomarsino*, 97 Cal.App.2d 92 [217 P.2d 124]. Under the circumstances here appearing this point cannot be raised on appeal for the first time.

The order appealed from is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied May 11, 1951, and appellant's petition for a hearing by the Supreme Court was denied May 28, 1951.