[Crim. No. 5726. Second Dist., Div. Three. Nov. 8, 1957.]

THE PEOPLE, Respondent, v. NORMAN W. SCHMITT, Appellant.

Caryl Warner and Warner & Sutton for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, William B. McKesson, District Attorney (Los Angeles), and Joseph P. Busch, Jr., Deputy District Attorney, for Respondent.

SHINN, P. J.—By indictment Dr. Norman W. Schmitt and Dr. R. Evelyn Alvord were accused of conspiracy (Pen. Code, § 182, subd. 1), and of conspiring with Faye Reed to violate section 484 of the Penal Code (theft) and section 17500 of the Business and Professions Code (false advertising). The indictment set out 13 overt acts allegedly committed in furtherance of the conspiracy. Upon a jury trial, defendants were found guilty of conspiracy to commit grand theft. They made motions for a new trial, which were denied. Proceedings were suspended as to Dr. Alvord and she was placed on probation for three years on condition that she pay a $1,000 fine. Proceedings were likewise suspended as to Dr. Schmitt and he was placed on probation for five years on condition that he serve the first year in the county jail and pay a $5,000 fine.[1] Schmitt appeals from the judgment (Pen. Code, § 1237), and the order denying him a new trial. Dr. Alvord has not appealed.

The conviction of Dr. Schmitt was based upon evidence of the following facts. He is a licensed chiropractor and has practiced in Los Angeles since 1936. We shall refer to him hereinafter as defendant. From June 1953 until March 1955 Faye Reed worked in his office as a receptionist and nurse; her duties included the taking of patients' case histories and the giving of treatments with a machine called an oscilloclast. Dr. Alvord is licensed as an osteopath in Missouri and Kentucky. Although a resident of California since 1945, she has not applied for a license in this state. Beginning in 1953, Dr. Alvord analyzed blood samples which Dr. Schmitt sent to her home in Costa Mesa, using a machine called a radioscope. The radioscope and the oscilloclast will be described at a later point in our opinion.

---

[1] Other conditions of Dr. Schmitt's probation were that he "do not solicit, accept, make or have made through others, any blood analysis for anyone on the radioscope or any similar device; do not treat patients by means of the oscilloclast. . . ."

October 12, 1953, defendant was consulted by Charles Stamps, who told him that Mrs. Stamps was suffering from cancer, that she had had four operations, and that she was unwilling to submit to a fifth operation for removal of a rectal cancer, which her physician, Dr. Ralph Byrne, had advised her to do. Defendant said: "Oh, don't let him take that off. I believe that I can cure that without an operation." He also said that he could detect the presence of cancer through a blood test and that he had cured 500 to 600 cases of cancer in his office.

The following day, Mrs. Stamps went to Schmitt's office, where Mrs. Reed extracted a sample of her blood. The blood was wrapped in tinfoil and sent to Dr. Alvord. Several days later, Schmitt told Stamps that he had good news from the laboratory. He said that Mrs. Stamps had an enlarged heart, tuberculosis, and a scattering of cancer in the colon; the growth on her buttocks was not a cancer but was a fatty tumor. He stated that he could guarantee a cure after two or three months' treatment with an oscilloclast. Shortly thereafter, Mrs. Stamps began taking oscilloclast treatments at defendant's office; she went several times a week and paid $2.50 a treatment. In January 1954, Mrs. Stamps had another blood test and defendant told her husband that the tuberculosis was clearing up and her heart was returning to normal. When Stamps complained that the growth on his wife's buttocks was increasing in size and causing her severe pain, Schmitt said: "Oh, that is just fine. That shows that this machine, this electricity is drawing all the cancer from the body. It is killing the cancer and drawing it into this fatty tumor." The treatments continued until June 1954, when Mrs. Stamps could no longer sit down, due to the size of the growth; defendant told Stamps that his wife was overcharged with electricity and needed a rest. By that time, Stamps had paid defendant nearly $200 for blood tests and treatments with the machine. August 15, 1954, Stamps telephoned defendant about his wife's condition and defendant advised him not to call Dr. Byrne. The following evening, Schmitt paid a visit to Mrs. Stamps in order to see the growth, which he had not previously examined; it was then the size of an orange. He cut some of it off and told Stamps that the wound would heal in a few days, that the oscilloclast had drawn all the cancer in Mrs. Stamps' body into the fatty tumor, and that she would never again be troubled with cancer. Early the next month, however, Mrs. Stamps underwent an operation

for the removal of a rectal cancer. The operation was performed by Dr. Byrne, who had first examined Mrs. Stamps in 1952. He testified that he had diagnosed the growth at that time as a malignant tumor. Mrs. Stamps died of cancer in September 1955.

Hazel Snyder consulted defendant in April 1954, giving a history of pain in her side and a lack of pep and vitality. Defendant said "We will take a blood test and see what is wrong with you." A few days later he read to her from a sheet of paper what he said were the results of a laboratory analysis of her blood showing that she had a cancerous irritation originating in the colon and cancers in the thyroid and neck. Schmitt told her that he had had 22 unsuccessful operations for cancer of the rectum, but was cured with the oscilloclast. He stated that a year's use of the machine would cure her condition. Thereupon Mrs. Snyder began taking regular treatments at defendant's office, for which she paid a total of $500. She discontinued the treatments after a year and consulted Dr. Charles Muller, a qualified physician, complaining that she still had a pain in her side and felt tired and worn out. Dr. Muller gave her a complete physical examination. He testified that Mrs. Snyder was suffering from a mild liver irritation, had a normal (though enlarged) thyroid, and was overweight. He found no evidence of cancer. After treatment for her overweight condition, Mrs. Snyder's health improved considerably.

In the latter part of 1954, Mr. and Mrs. Enrique Patt took their children, Bonnie and Lorry, to see defendant. Schmitt told Mrs. Patt that he didn't like Bonnie's complexion and suggested a blood test. He took blood samples from Bonnie and the other members of the Patt family. Shortly thereafter, he told Mrs. Patt that Bonnie had a low blood count, which was due to a dormant cancer in the spleen and a tubercular infection in the liver, but that the oscilloclast would restore the electrons in her daughter's system to normal within six to eight months. He said that Mrs. Patt had low grade tuberculosis in the chest, sinus and pelvis, and benign tumors in the uterus and cranium. He also said that Lorry was suffering from malfunction of the endocrine glands and osteomyelitis of both eyes; there was some nonmalignant cancer in Lorry's spleen, bone marrow and cranium. The Patts rented an oscilloclast from defendant at a rental of $30 a month and used the machine for several months at their home.

Mrs. Patt testified that the treatments were discontinued when Faye Reed told her that the machine was a fraud.

Mrs. Swannie Schaafsma brought her son, Lauren, to defendant's office sometime in 1953. Lauren was unable to walk or talk and was confined to a wheel chair; he was 3½ years old. His mother told defendant that Lauren's condition had been diagnosed as cerebral palsy but Schmitt said that a blood test would determine what was wrong with him. Defendant took a sample of the boy's blood, and when Mrs. Schaafsma returned for the results of the laboratory analysis, defendant told her that Lauren had tuberculosis and adhesions of the spine and that scar tissue in his central nervous system had affected his reflexes. Schmitt said that Lauren ''can be cured within a year, after a year's treatment he will be walking.'' The boy received treatments with the oscilloclast during the ensuing year, for which Mrs. Schaafsma paid between $400 and $500. Additional blood tests were taken every month and after each test defendant told Mrs. Schaafsma that her son was getting better. She testified that Lauren's condition at the time of the trial was the same as it had been when she first consulted Schmitt, except that he had grown.

A similar series of events was described by Mrs. Clare Spalliero, who took her son, Butch, to see defendant in October 1953. Mrs. Spalliero told defendant that Butch was a spastic and was unable to talk, and asked him if he could help; Schmitt replied that as soon as he took a blood test, he could tell whether he could help or not. Several days later, Schmitt told her that Butch had tuberculosis and cancer of the brain and spleen. He said that the boy would be completely normal after a year's treatment with the oscilloclast. Butch took the treatments for nearly a year and a half, for which his mother paid defendant about $400.

The Schaafsma and Spalliero boys had been examined by Dr. Robert Sedgwick in 1952. Dr. Sedgwick, a qualified physician specializing in neurology, testified that Lauren Schaafsma was afflicted with cerebral palsy, which was due to the failure of his brain to develop; he found no evidence of tuberculosis or spinal adhesions. He stated that the Spalliero boy was suffering from maldevelopment of the brain, and that he had found no indication of cancer or tuberculosis. It was his opinion that both children had sustained irreparable brain damage and that medical science had no known cure for their condition.

Dr. Schmitt was likewise consulted by Mrs. Antoinette Capanna, who brought her 2-year-old daughter, Denise, to his office in June 1953. Mrs. Capanna told defendant that her girl was mentally retarded and had suffered a brain injury. When she said that she had been told that nothing could be done for Denise, Schmitt replied: "Oh, that isn't true. I can cure her in six weeks. . . . I do it every day." Defendant took some blood from Denise and telephoned her mother a few days later. He said that Denise had anemia, liver trouble, sinus trouble and cancer of the brain. Denise did not receive any treatments from Dr. Schmitt. Several months before visiting defendant's office, she had been examined by Dr. Milton Heifetz, a qualified nerve surgeon. Dr. Heifetz diagnosed her condition as petit and grand mal seizures due to diffuse cerebral atrophy, which was probably caused by a lack of oxygen at birth. He testified that his examination disclosed no evidence of cancer and that medical science had no remedy for her condition.

Mrs. Hermine Szabo went to see defendant in December 1952, complaining that she felt tired and run down. Defendant said he wanted to have her blood analyzed and Mrs. Szabo submitted to a blood test. A few days later Schmitt told her that she was in very bad shape, that her kidneys were bad, her spleen was deteriorating, and that she had cancer of the liver; he told her that he could cure her but that it would take a long time. She took several treatments with the oscilloclast and then consulted Dr. Robert Weber, who was a qualified physician. Dr. Weber gave Mrs. Szabo a complete physical examination. He testified that he found no symptoms of cancer.

Richard Lewis visited defendant's office in January 1954, complaining of pains in his foot. After a series of foot adjustments had proved unsuccessful, Schmitt examined Lewis' feet through a fluoroscope and told him that he needed a blood test because he had either tuberculosis or cancer of the bone. Schmitt took a sample of Lewis' blood and began giving him treatments without waiting for the results of the analysis. Shortly thereafter, defendant told Lewis that he had cancer, tuberculosis of the brain, and tuberculosis of the foot, male organ and liver. After 15 oscilloclast treatments, which did not cure the pain in his foot, Lewis consulted Dr. Paul Pernworth, a qualified physician. Dr. Pernworth testified that he examined Lewis and found no evidence of cancer or tubercu-

losis. He sent Lewis to another physician who prescribed foot strappings which improved Lewis' condition considerably.

As we have said, the blood samples given to defendant by his patients were analyzed by Dr. Alvord with a device called a radioscope, which is a black box containing two electrical circuits, dials, switches, a variable condenser, an electrode or trap door, and some attachments. The radioscope was apparently invented by the late Dr. Albert Abrams, who was the founder of the electronic school of medicine. Abrams thought that disease is a lack of harmony in the electronic oscillations of the human body, that diseased tissue gives off a rate of energy different from normal tissue, and that each disease has its own rate of vibration. Followers of Dr. Abrams use the radioscope to measure the vibratory rate of electromagnetic energy in different parts of the human system.

In using the radioscope, Dr. Alvord was helped by an assistant, a Mrs. Ogle. Dr. Alvord first unwrapped a blood sample from its tinfoil container and placed it in the trap door of the machine, which she then closed. Next she clipped one of the attachments to the side of Mrs. Ogle, who stood in front of the machine with her abdomen exposed. Mrs. Ogle held another attachment in her hand, and touched it to various parts of her body as directed by Dr. Alvord. Meanwhile, Dr. Alvord took a glass wand or conductor and stroked it across the left side of Mrs. Ogle's bare abdomen. While stroking the wand, Dr. Alvord turned the dials on the machine and made notations of the vibratory rates of electromagnetic energy indicated by the machine as Mrs. Ogle touched the attachment to different parts of her body. After determining the vibratory rates, Dr. Alvord referred to an "Atlas" prepared by a Dr. Colson, which correlated the rates of vibration with particular kinds of disease energy. Then she prepared a treatment chart, which she sent to defendant; this chart stated the nature of the patient's illness and gave directions as to the particular part of the patient's body to be treated with the oscilloclast. Dr. Alvord received from Schmitt $10 for the first blood test and $5.00 for subsequent tests.

The oscilloclast is a kind of vibrator. It is a black box, somewhat larger than the radioscope, containing two circuits, one of which is electronic and the other electric. It also has a number of dials and attachments. The electric circuit carries a 60-cycle alternating current, while the electronic circuit is composed of two vacuum tubes; one tube is connected to an oscillator which resonates at about 40 megacycles and the other

tube acts as a switch, turning the power on and off at a rate of 90 times a minute. In theory, the oscilloclast dissipates disease energy by eradicating the electrical impulses emitted by the disease. Thus in giving treatments with the machine, the attachments are placed against those parts of the patient's body which are affected by the disease, and the dials are adjusted so as to transmit the precise rate of energy which, according to Colson's "Atlas," will counteract the disease.

A number of expert witnesses, testifying on behalf of the People, gave their opinions as to the scientific value of the radioscope and the oscilloclast. Dr. Moses Greenfield, a nuclear physicist, qualified as an expert on the effect of nuclear energy upon the human body. He testified that the radioscope would not measure any electromagnetic energy emitted by a piece of dried blood for the reason that the radioscope is a closed circuit; electric current cannot flow in a circuit unless there is some source of energy and no energy is exchanged in the machine. The machine would not send any physical signals to Dr. Alvord or Mrs. Ogle and any sensations felt by the latter would be wholly subjective and unconnected with the radioscope. He stated that the power generated by the oscilloclast (5/100th of a watt) is so minimal that the machine could not produce chemical changes in the human body; treatments with the machine would have no more effect than a vigorous rubbing of the skin. David Robbart, a police radio technician, gave similar testimony as to the oscilloclast. He stated that he attempted to measure its power in relation to its electronic output but found the power was so slight that it could not be measured.

Dr. Justin Stein, a physician specializing in the treatment of cancer, testified that at the present time there is no blood test which affords a specific or conclusive diagnosis of cancer. (Dr. Harry Penn, a cancer researcher called by defendant, testified that he is working with a blood serum test for cancer, but that the test has not yet been perfected.) According to Dr. Stein, the only positive test for cancer is a biopsy, which is an examination under a microscope of tissue removed from a patient's body.

A similar opinion was expressed by Dr. Ian Macdonald, who is also a physician and specialist in cancer. Dr. Macdonald also testified that long wave radiation, as used in the oscilloclast, cannot destroy cancer cells, and that the application of 5/100ths of a watt power at a frequency of 40 to 44 megacycles

would have no effect upon a cancer. He stated that the type of electromagnetic radiation effective against cancer would be in the neighborhood of 200,000 volts.

Dr. Alvord, testifying in her own behalf, stated that she studied electronic medicine at the Electronic Medical Foundation in San Francisco. In performing a blood analysis, she followed the techniques prescribed by the writings of Dr. Abrams and accepted his conclusions respecting the correlation between particular disease energies and electromagnetic vibration rates; however, she did not know whether those conclusions had been confirmed by other research. Although heart action, pain and vitality are not diseases, the radioscope gives readings for them. She never studied nuclear physics but took a six-week course in electronics. She made no independent inquiry about the radioscope and never checked her clinical findings with findings from other laboratories. She stated her belief that the radioscope can detect cancer before it has reached the stage where it can be discovered under a microscope. Except for analyzing blood samples and recommending specific treatments with the oscilloclast, she had nothing to do with either Schmitt's patients or the operation of his office. She was aware that an action was brought against the Electronic Medical Foundation in the fall of 1953 but she never inquired about it as she had too many other things to do.

Defendant likewise took the stand in his own defense. His original specialization was the treatment of foot ailments. After undergoing 22 operations for a rectal cancer, he had his blood tested at the foundation and was cured by a series of treatments with the oscilloclast. This personal experience convinced him of the value of the electronic theory of medicine, which he described as the use of magnetic energy to change body chemistry. He began using the oscilloclast in 1946 and had 14 machines in his office. Before meeting Dr. Alvord he sent blood samples to the foundation for analysis. He was introduced to Dr. Alvord in 1953 by a Mr. West, who was connected with the foundation; he sent blood samples to her because of her speed and efficiency. In diagnosing illnesses and prescribing oscilloclast treatments, he relied entirely on the "Atlas" and on the reports and treatment charts submitted by Dr. Alvord; he always parroted her words to his patients. He never disagreed with her findings and never advised a patient to go to another laboratory because no laboratory could do work which was comparable to hers. It was his opinion that the Spalliero, Capanna and Schaafsma

children were not suffering from cerebral palsy and that Lauren Schaafsma had not sustained any brain damage. He stated that his treatments changed Butch Spalliero from an idiot into a moron and that the boy was 90 per cent normal for a moron. Mrs. Stamps was his only cancer patient whose condition did not improve after taking the treatments.

On cross-examination Schmitt was asked whether, after October 1953, he heard that the Electronic Medical Foundation, of San Francisco, was involved in litigation. Counsel objected to the question on the ground that it was immaterial, but the court ruled that it might have some bearing on defendant's motives. In response to the question, Schmitt testified that he received from Mr. West sometime after March 15, 1954, a typewritten copy of a consent decree of injunction pendente lite in an action whereby the United States of America sought to enjoin the foundation from mislabeling oscilloclasts and radioscopes which were shipped in interstate commerce. He admitted reading the decree, but stated that the document did not dissuade him from using the machines for the reason that the alleged mislabeling had nothing to do with their therapeutic value.

Dr. Winston S. Sibson, a licensed chiropractor called by the defense, testified that he uses the oscilloclast in his practice, though in an adjunctive capacity; he would not use it alone in the treatment of cancer, tuberculosis or cerebral palsy. Four of Schmitt's former patients also testified in his behalf. They stated that they had taken treatments with the oscilloclast and had been cured of various complaints.

All the points raised on the appeal may be discussed under the headings: (1) The court erred in the admission of evidence allegedly obtained by means of an unlawful search and seizure; (2) defendants were not sufficiently advised of the charges against them; (3) the court unduly restricted the cross-examination of witnesses for the People; (4) the court erred in quashing a subpoena duces tecum issued upon defendant's application; (5) the evidence was insufficient to support the verdict; (6) the court erred in instructing the jury; (7) misconduct was committed by one of the People's witnesses; (8) the district attorney was guilty of prejudicial misconduct in his closing argument to the jury.

As to the first point, Schmitt contends that the court should not have received in evidence any of the medical records, papers and equipment which were removed from his office

without a search warrant by police officers and an investigator for the state medical board. We cannot agree.

On April 4, 1955, Faye Reed went to see Bydie S. Woodruff, an investigator for the State Board of Medical Examiners. She told him about the operation of Schmitt's office and gave him the names of some of Schmitt's patients; among the names was that of Mr. Stamps, whom Woodruff contacted the following day. Shortly thereafter, a misdemeanor complaint was issued at Woodruff's instigation, charging defendant with a violation of section 26286.5 of the Health and Safety Code in that he advertised a drug or device represented to have an effect on cancer. We set out a portion of the statute in the margin.[2] On April 14th, Woodruff went to Schmitt's office in the company of several police officers and an investigator for the Pure Food and Drug Administration; they had a warrant for his arrest but did not have a warrant to search the premises. After arresting defendant, Woodruff and the officers subjected the office to an intensive search which lasted several hours. They removed and carried away in a truck six oscilloclasts, a file drawer containing patients' case histories, a loose leaf ledger containing tax and financial records, three file cases containing similar material, two oxygen meters and miscellaneous office equipment.

Woodruff testified at the trial that he was careful not to take records pertaining to defendant's foot treatments because he was interested only in records concerning use of the oscilloclast; in searching the case history file, he looked for names mentioned by Mrs. Reed. The following day, he turned over to the district attorney the materials which had been seized but he continued his investigation. He and his fellow officers interviewed about 50 of Schmitt's patients, most of whose names they obtained from the files. Woodruff stated that he mainly interviewed persons who had taken treatments from defendant within the year immediately preceding issuance of the complaint; others were interviewed in order to establish a scheme or design on the part of defendant. It appears that no further action was taken in the misdemeanor case and that on May 31st the grand jury returned the present indictment.

---

[2] "§ 26286.5. Advertisement of drug or device represented to have any effect on certain diseases. The advertisement of a drug or device represented to have any effect in any of the following diseases is unlawful and prohibited: albuminuria, appendicitis, arteriosclerosis, blood poison, bone disease, Bright's disease, cancer. . . ." The complaint also accused Schmitt of using the suffix "Dr." in his practice without the qualification "D.C.," in violation of section 15 of the Chiropractic Act.

At the commencement of the trial, defendant made a motion to suppress evidence upon the ground that the search was illegal and a violation of his constitutional rights. In support of the motion he submitted an affidavit, alleging that the papers and equipment removed by the officers were wholly unrelated to the offense for which he was arrested and that the search and seizure were therefore unreasonable. No counteraffidavits were filed and no testimony was taken on the motion. During the argument, counsel for Schmitt conceded the validity of the arrest. The motion to suppress evidence was denied and it was not renewed at any stage of the proceedings. Defendant did not object to the introduction of any specific item of evidence on the ground that it was unlawfully obtained.

We have made a careful examination of the lengthy transcript in an effort to determine which of the items seized at defendant's office were actually used in evidence. An oscilloclast was placed in evidence by the People, but it appears that the machine was the one which Schmitt had rented to Mr. and Mrs. Patt; one of the machines taken by Woodruff was offered in evidence by defendant. Case histories and blood test reports relating to witnesses for the People were introduced in evidence by the district attorney; the remainder of the case histories were offered in evidence by defendant at the close of the testimony.

Although the record permits a doubt whether the motion to suppress evidence was sufficient to preserve the question for the purposes of an appeal, we prefer to consider the issue on its merits. ██ Since the arrest under section 26286.5 of the Health and Safety Code was lawful, the officers had the right to make a reasonable search of the premises under Schmitt's immediate control and to seize evidence related to that offense. (*People* v. *Winston*, 46 Cal.2d 151, 161-163 [293 P.2d 40], and cases cited.

It was a proper inference from Woodruff's testimony that the officers were acting in good faith and were seeking physical and documentary substantiation of the charge that Schmitt was guilty of the representations forbidden by the statute. The term "advertisement," as used in the statute, means, among other things, all representations "disseminated in any manner or by any means, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase or sale of drugs or devices." (Health & Saf. Code, § 26209.)

■ The term is broad enough to include oral representations. (*People* v. *Galway,* 120 Cal.App.2d 45, 49 [260 P.2d 212].)

■ It cannot be doubted that the oscilloclast is the kind of device contemplated by the statute, that Schmitt used it in the treatment of cancer, and there was direct evidence that he told his patients the machine would effect a cure. The items offered in evidence by the People were directly related to activity falling within the scope of section 26286.5 and would have been competent and material evidence against defendant in a trial on the misdemeanor charge; the machines were the subject of the prohibited representations and while advertising the benefits of the machine to his patients, defendant referred to the case histories and quoted from the blood test reports. Those introduced by the People were relevant to the representations made by defendant to witnesses for the People respecting treatment for cancer and tuberculosis. It is not argued that the evidence seized by the officers and which was introduced by the People was not relevant to a charge of conspiracy to commit theft by false pretenses. We are of the opinion that the evidence secured by the officers and offered by the People was properly admitted and that it was not to be excluded merely because it was offered in order to support a more serious charge than the accusation contained in the misdemeanor complaint. Our conclusion is not inconsistent with *People* v. *Mills,* 148 Cal.App.2d 392 [306 P.2d 1005], which is relied upon by defendant. Mills was arrested in his office for a violation of the corporate securities act. At the time of his arrest, the officers had already secured convincing proof of his guilt. Nevertheless, they made a thorough search of the premises and found evidence which led to his conviction on a dozen other felony counts. In that case, the court reversed the judgments as to the counts based on evidence uncovered during the search, holding that the search was wholly exploratory, unreasonable, and that it could not be justified as an incident to a lawful arrest. In the present case, Schmitt's medical records which were received in evidence were connected with the commission of the crime for which he was arrested.

There is merit in defendant's argument that even if the search was relevant to the arrest it went to unreasonable lengths. It appears that there was a general ransacking of defendant's offices and that nearly everything in sight was carted away for future examination, but the question here is whether evidence obtained illegally was used against the

defendant. And, as we have shown, the evidence that was used was uncovered in the course of a search that was permissible, since it was relevant to the complaint under which the arrest and search were made and reasonably necessary in order to make a thorough search. The fact that other documents and records were seized, which were not used in the prosecution, could not have influenced the verdict or affected the validity of the conviction. There is no error in the admission of the exhibits.

There is also no basis for defendant's contention that he was not informed as to the nature of the charges against him and not given an opportunity to answer them. ▆ The indictment was sufficient to charge him with the commission of a public offense. (Pen. Code, §§ 950-951-952), and it was unnecessary for the accusatory pleading to specify the kind of theft with which he was being charged. (*People* v. *Brock*, 21 Cal.App.2d 601, 607-608 [70 P.2d 210].) ▆ The indictment alleged 13 overt acts committed by Doctors Alvord and Schmitt in pursuit of the methods they jointly employed in the examination of patients; in making blood tests and reporting to the patients the results thereof, namely, that the persons examined were suffering from cancer or tuberculosis, or both; in representing that the treatments to be administered would cure and had cured said diseases; and in the use of the radioscope for the making of tests and the oscilloclast in the administration of treatment. These allegations of the indictment together with the charge of conspiracy to commit theft and statements of the district attorney that the People were proceeding on the theory of conspiracy to commit theft by false pretenses were sufficient to advise the defendants of the nature of the charges they would be required to meet.

With respect to the third point, it is contended that the court unduly limited the cross-examination of some of the People's witnesses. In this connection, defendant assigns as error 16 rulings wherein the court sustained objections to questions asked by counsel on cross-examination. As to the majority of these assignments of error, suffice it to say that the questions counsel proposed to ask were objectionable in that they called for hearsay, assumed the truth of facts which were not in evidence, or were as to immaterial or inconsequential matters. No useful purpose would be served by a separate discussion of each ruling. The trial lasted for two months. The court was extremely liberal in permitting cross-

examination by defense counsel, which was vigorous and thorough. However, several assignments of error deserve more extensive consideration.

One theory of defense adopted by Schmitt's counsel was that his client was being persecuted for his scientific beliefs and that the American Cancer Society, Mrs. Reed and a local television station were conspiring to put him out of business. It appears that Schmitt was arrested during the annual fund-raising drive of the cancer society and that three days after the arrest, Station KTTV broadcast a televised exposé of his methods of treatment. Dr. Stein and Dr. Macdonald, who testified as expert witnesses for the prosecution, were officers in the state division of the American Cancer Society. Each stated that he never received any of the society's funds, had no connection with its fund-raising activities, that he did not know Mrs. Reed, and that he was first contacted in relation to the case by Woodruff. On cross-examination, counsel proposed to ask them whether they knew how much money the cancer society had in its bank account and whether they knew that Schmitt's prosecution was being used to publicize the fund-raising drive. Objections to these questions were sustained on the ground that they were immaterial. He offered to prove the society's bank balance but the offer of proof was rejected by the court. As to these questions, his argument is that the purpose of the questions was "to prove the interest of the medical experts who were on the Cancer Panels, and also to show the relationship between the American Cancer Society, and the KTTV Television Program, and Mrs. Faye Reed."

Certainly great latitude should be allowed in cross-examination for the purpose of showing the state of mind of a witness, his interest in the case and his bias and prejudice. However, the court may and should limit the cross-examination of witnesses in order to confine it within reasonable bounds and curtail digressions which serve no purpose as proof of any disputed material fact in the case. (*People* v. *Lantz*, 120 Cal.App.2d 787, 791 [262 P.2d 19].) Since the witnesses denied knowing Mrs. Reed and denied having any control over the funds of the cancer society, we do not believe that the line of questioning proposed by defendant, if permitted, would have been advantageous to him, or that he suffered any disadvantage or prejudice through the rulings of the court.

It is also argued that the court erred in sustaining objec-

tions to numerous questions asked Faye Reed on cross-examination. Counsel proposed to ask her whether she gave evidence against defendant because she was named in the indictment as a coconspirator, whether she believed she was violating the law while working for him, whether she believed she was guilty of conspiracy, and whether she was trying to cheat people while in his employment. It is doubtful that these questions were asked with the expectation that the witness would give affirmative answers. Counsel also proposed to ask Mrs. Reed whether she helped to "case" defendant's office, whether she helped Woodruff to organize a raid, and whether she knew that 15 officers had descended on the premises. Counsel stated that the purpose of the questions was to show Mrs. Reed's motive and bias. Objections to these questions were sustained. While great latitude should be permitted in cross-examination for the purpose of developing bias and prejudice no harm resulted from the rulings. There was abundant evidence that the witness had given information to the authorities and was opposed to defendant's methods. Her cross-examination was extensive with respect to her activities, motives and interest in the case.

As to the fourth point, defendant asserts error in the granting of the People's motion to quash a subpoena duces tecum addressed to station KTTV. The subpoena sought the production of the station's "financial records, charges, reports, correspondence and memorandum" relating to the above-mentioned television broadcast, "including records of payment by American Cancer Society and/or Public Relations agent therefore." The affidavit for the subpoena averred that those documents were material to prove "interest and bias of witness Dr. Ian McDonald, Fay Reed, and others, and the system, plan, and scheme of the American Cancer Society to persecute defendants."

In support of his motion, the district attorney argued that the affidavit was indefinite and insufficient to show the materiality of the documents. The court postponed its ruling until the following morning in order to give counsel an opportunity to file a supplemental affidavit, but no new material was presented. Section 1985 of the Code of Civil Procedure provides that all applications for subpoenas duces tecum shall be accompanied by an affidavit specifiying the exact matters or things desired to be produced, and setting forth in full detail the materiality thereof to the issues involved in the case.

█ The accompanying affidavit must clearly show that the requested papers contain competent and admissible evidence which is material to some disputed issue of fact at the trial. (*McClatchy Newspapers* v. *Superior Court,* 26 Cal.2d 386 [159 P.2d 944]. See also *Proctor & Gamble Co.* v. *Superior Court,* 124 Cal.App.2d 157, 161 [268 P.2d 199]; *Nelson* v. *Superior Court,* 9 Cal.2d 729, 732 [73 P.2d 232].) The allegations of defendant's affidavit were wholly insufficient to show what material facts, if any, would or could have been proved by the documents sought to be produced. We are therefore of the opinion that the court did not err in quashing the subpoena duces tecum.

With respect to the fifth point, Schmitt contends that the evidence was insufficient to support the conviction of conspiracy to commit grand theft. █ The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. (Pen. Code, §§ 182, 184; *People* v. *Frankfort,* 114 Cal.App.2d 680, 688 [251 P.2d 401].) █ The existence of the conspiracy may be established by circumstantial evidence (*People* v. *Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17]), and it may be inferred from the acts and conduct of the accused in mutually carrying out a common purpose in violation of the statute. (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296].) █ Furthermore, the overt act may be accomplished by only one of the conspirators, for the members of the conspiracy are bound by all acts of all members done in pursuance of the agreed plot. (*People* v. *Pierce,* 110 Cal. App.2d 598, 610 [243 P.2d 585].)

█ . Theft is characterized as the felonious taking of property which is not one's own. (Pen. Code, § 484; *People* v. *Moorehead,* 104 Cal.App.2d 688, 694 [232 P.2d 268].) █ Since the amendment in 1927 of section 484 of the Penal Code, the separate offenses of larceny, embezzlement and obtaining property by false pretenses have been merged into the one classification. (*People* v. *Cannon,* 77 Cal.App.2d 678, 688-689 [176 P.2d 409].) It was the theory of the prosecution at the trial that Schmitt was guilty of conspiring with Dr. Alvord and Mrs. Reed to obtain money from his patients by false pretenses. █ The elements of theft by false pretenses are as follows: "To support a conviction of theft for obtaining property by false pretenses, it must be shown that the defendant made a false pretense or representa-

tion with intent to defraud the owner of his property, and that the owner was in fact defrauded. . . . The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause." (*People* v. *Ashley*, 42 Cal.2d 246, 259 [267 P.2d 271].)

False pretense is defined as "a representation of some fact or circumstance calculated to mislead, which is not true." (*People* v. *Wasservogle*, 77 Cal. 173, 175 [19 P. 270].)

Defendant argues that he made no false representations of fact to the complaining witnesses and that a finding that he intended to deceive them is without support in the evidence. We cannot agree.

Defendant's attorneys, of course, know full well and recognize that it is not our function as a reviewing court to reweigh the evidence and to substitute other inferences for those reasonably drawn by the triers of fact and that we are limited to determining whether there was any substantial evidence to support the implied findings of the jury. The argument that there was no substantial evidence is unavailing. The testimony of the People's witnesses revealed a consistent course of conduct on the part of Dr. Schmitt, Dr. Alvord and Mrs. Reed. In each instance, Schmitt told the prospective patient that laboratory analysis of a blood sample was necessary in order to make a proper diagnosis. The patient paid Schmitt $15 and a specimen of his blood was sent to Alvord, who analyzed it with the radioscope and submitted her findings to Schmitt. When the patient returned to his office, Schmitt read from papers or told him orally the results of Alvord's laboratory analysis, viz., that he was afflicted with either cancer or tuberculosis or both. Schmitt then assured the patient that he had successfully treated hundreds of similar cases with the oscilloclast and that treatments with the machine would cure the conditions disclosed through the blood test. Most of the complaining witnesses thereupon submitted to a lengthy, expensive and fruitless series of treatments, which were administered by Mrs. Reed. In view of Dr. Alvord's representations as to the reliability of her reports, her knowledge that Schmitt was using them in the treatment of patients and the long continued use of their methods in the treatment of cancer and tuberculosis it was a reasonable conclusion that each had equal responsibility with the other for the representations that were made and that they had but a single purpose in mind.

Defendant strenuously argues that the therapeutic value of the radioscope and oscilloclast are matters upon which reasonable minds may differ, and that since they are the subject of genuine dispute among scientists, his representations may not be made the basis of a criminal charge. The argument is without merit. The only dispute was between defendant's contention that his representations as to what he had accomplished and could accomplish were true and the evidence which tended to prove they were false.

There was expert testimony which, if believed by the jury, would support inferences that the radioscope cannot measure the electromagnetic energy emitted by a bit of dried blood and that, in any event, a blood test does not afford a specific diagnosis of cancer. The jury could reasonably conclude from the testimony of Schmitt's patients and their physicians that the purported diagnoses prepared by Alvord and repeated by him were false and misleading. There was also expert testimony which, if credited by the jury, tended to show that the oscilloclast was ineffectual in the treatment of cancer. This testimony, together with the circumstances related by Mr. Stamps, would warrant a conclusion that there was no truth in defendant's statements that he had cured hundreds of cancer cases with the machine. ▆▆▆ A single false material representation is sufficient to constitute the offense of obtaining property by false pretenses. (12 Cal.Jur. 469-470; *People v. Cravens,* 79 Cal.App.2d 658, 664 [180 P.2d 453].)

▆▆▆ Whether Schmitt's representations about the radioscope and oscilloclast were material inducements to his patients in taking treatments with the latter machine was a question of fact for the jury (*People v. Hong Quin Moon,* 92 Cal. 41 [27 P. 1096]; *People v. Kemp,* 124 Cal.App.2d 683, 687-88 [269 P.2d 186]; *People v. Adams,* 137 Cal.App.2d 660, 668 [290 P.2d 944]), and it was a proper inference and, we believe, a necessary one, that his patients were led by those representations to believe that treatments with the oscilloclast were indispensable in order to restore them to health.

▆▆▆ Whether the representations were made honestly or with an intent to deceive was likewise a question of fact to be resolved by the jury from all the circumstances in evidence. (*People v. Henderson,* 79 Cal.App.2d 94, 118 [179 P.2d 406]; *People v. Baird,* 135 Cal.App.2d 109, 114 [286 P.2d 832].)

Defendant vigorously maintained at the trial and now argues that he did not intend to defraud his patients and

that he was practicing electronic medicine in good faith. The jury passed upon that precise question and there was substantial evidence to justify the implied conclusion that he intended to deceive his patients for his own gain. He testified that he never checked the findings prepared by Alvord and that he used no other diagnostic techniques; he stated that he relied upon the diagnostic theories of the "Atlas." However, on the first page of the "Atlas," which was before the jury, appears the statement that the electronic test does not purport to take the place of physical examinations, urinalysis, blood counts, X-rays and microscopic examinations. ▉ Defendant's admissions could be considered by the jury in relation to the issue of his good faith. (*People* v. *Markos,* 146 Cal.App.2d 82, 85 [303 P.2d 363].) In addition, the jury could also consider the fact that defendant made a number of diagnoses which he knew were contrary to those made by physicians who had previously made examinations. When Mrs. Schaafsma and Mrs. Spalliero brought their children to see Schmitt, they informed him that the children had been examined by physicians and that they had been told that the children were suffering from permanent and irreparable damage to the brain. Defendant nevertheless stated that the children were afflicted with cancer or tuberculosis, and that he could cure them. The record discloses numerous other irreconcilable discrepancies between the claimed results of the blood tests and the findings of licensed physicians. It is unnecessary to make further reference to the testimony heretofore recited. The jury could properly determine either that defendant knew of the falsity of his representations or that he made them recklessly and without information which would justify him in a belief that they were true. (*People* v. *Cummings,* 123 Cal. 269 [55 P. 898]; *People* v. *Daener,* 96 Cal.App.2d 827 [216 P.2d 511]; *People* v. *Ryan,* 103 Cal.App.2d 904 [230 P.2d 359]; *People* v. *Davis,* 112 Cal.App.2d 286 [246 P.2d 160]; 12 Cal.Jur. 457.) ▉ We therefore conclude that there was sufficient evidence to warrant an inference that the representations were made with an intent to defraud and that defendant's sole purpose was to induce his patients to take and pay for a series of treatments which he knew would be unavailing.

▉ It is argued that since the complaining witnesses contracted for treatments with the oscilloclast and actually received what they bargained for, no fraud was practiced upon them. The argument is untenable. The patients paid for

more than they received, but even assuming that the treatments were reasonably worth the consideration paid, this is no defense where, as was the case here, the patients were induced to submit to them by means of false pretenses. (*People* v. *Pugh*, 137 Cal.App.2d 226, 232-33 [289 P.2d 826].)

As to the sixth point, Schmitt contends that the court committed error in the giving and refusal of instructions.

At the request of both the People and defendant, the court gave the instruction which we have set out in the margin.[3] In this connection, it is argued that the court erred in instructing the jury that false pretenses may consist of a representation made recklessly and without information justifying a belief that it is true. Defendant does not question that the challenged instruction was a correct statement of the law. (*People* v. *Cummings, supra,* 123 Cal. 269; *People* v. *Daener, supra,* 96 Cal.App.2d 827; *People* v. *Ryan, supra,* 103 Cal. App.2d 904; *People* v. *Davis, supra,* 112 Cal.App.2d 286.) Furthermore, we find no substance in the suggestion, advanced in defendant's briefs, that this instruction permitted the jury to base its finding of guilt upon negligence rather than upon theft by false pretenses.

It is next contended that the court erred in failing to give adequate instructions as to specific intent. The court read section 484 of the Penal Code and gave the instruction that

[3] "To constitute the crime of theft by obtaining property by false pretense, the false pretense used must be a fraudulent representation of an existing or past fact by one who knows it to be not true, or who makes the representation recklessly and without information justifying a belief that it is true, and it must be such as is adapted to induce the person to whom it is made to part with something of value.

"A mere expression of opinion or a statement concerning the future is not such a fraudulent representation.

"It is not necessary that the pretense be such as can not be guarded against by common prudence. Nor is it necessary that the fraudulent representation be made by words, if it may reasonably be inferred from a person's acts and conduct.

"Proof of these four facts must be made against the defendant before he may be found guilty of the crime of theft by means of false or fraudulent representations or pretense:

"1. The defendant must have intended to defraud the person named in the information as the one against whom the crime was perpetrated.

"2. Actual fraud must have been committed by the defendant against that person.

"3. Some false representation or false pretense must have been used by [or at the direction of] defendant for the purpose of perpetrating the fraud, and must have been a material element in inducing the owner to part with the property.

"4. The fraud must have been accomplished; that is, the defendant, by means of the fraud, must have induced the owner to part with the property, the owner intending to divest himself of title, and the defendant thus must have obtained the property."

we have already quoted. The court also gave two additional instructions which we have set out in the margin.[4, 5] These instructions, when considered together, were sufficient to inform the jury that they could not convict defendant without proof of a specific intent to defraud.

The court refused to give three instructions on the issue of good faith which were requested by defendant. We have likewise set them out in the margin.[6, 7, 8] Defendant

[4] "'In a prosecution for theft by false pretenses, if it is shown that the defendant practiced a fraud of a kind regarded by law as being a false pretense, *and with the intent to deprive another of property*, it is immaterial whether he did so to obtain property for himself or his own possession, or to accomplish its delivery to another, either for the benefit of that other or for the benefit of himself.'' [Emphasis ours.]

[5] "'Before one lawfully may be convicted of having obtained from any person any property or valuable thing by any false pretense, *used with an intent and design to cheat or defraud another*, the proof must comply with one or more of the following requirements:

"1. It must be shown that the pretense so used, or some note or memorandum thereof, was in writing, subscribed by, or in the handwriting of, the defendant; or

"2. It must be shown that the false pretense was expressed in language accompanied by some false token or by some false writing; or

"3. The pretense must be proved by the testimony of at least two witnesses or, if by only one witness, the testimony of that witness must be corroborated by circumstances shown in evidence.'' [Emphasis ours.]

[6] "'You are instructed that the charge against defendants does not involve negligence on their part, or that they acted foolishly, or that they did not exercise good judgment. This is a criminal case, and the essence of the offence is that defendants acted with bad intentions, and with the intent to cheat and defraud the persons named in the indictment. You are further instructed that unless such corrupt motives on the part of the defendants are shown beyond a reasonable doubt and to a moral certainty, then it is your duty to find them not guilty and to acquit them.''

[7] "'You are instructed that procuring money by false pretences, as defened in Section 484 Penal Code, contemplates:

"'A false pretense is such a fraudulent representation of an existing or past fact, by one who knows it not to be true, as is adapted to induce the person to whom it is made to part with something of value.''

"In this regard, the question is not whether the electronic technique practiced by defendants was or was not scientifically valid. The sole question is, did defendants in good faith believe that there was therapeutic merit to the technique. Unless the jury find beyond a reasonable doubt and to a moral certainty, that defendants in fact intended to defraud, and that they did not believe in the validity of the electronic technique, then in such an event you must find them not guilty and acquit them.''

[8] "'The jury in instructed that the question as to whether the services rendered were in fact proper or not, is not in issue in this proceeding. Neither is any question of negligence, or malpractice on the part of Dr. Schmitt an issue. The sole question is whether or not Dr. Schmitt and Dr. Alvord, with Fay Reed, wilfully and unlawfully conspired to cheat and defraud the patients named in the indictment. In this regard,

argues that rejection of these proposed instructions was error for the reason that the jury was thereby prevented from considering his defense that he made the representations in good faith. We think not. As we have already said, the court instructed the jurors that they could not convict Schmitt unless they found that he intended to defraud his patients. The jury was therefore required, under the instructions given by the court, to consider the question of his good faith, for it could not find an intent to defraud without of necessity making an implied finding that defendant was not acting in good faith. The proposed instructions merely restated the substance of the instructions on specific intent, although negatively and in another form. [22] When a jury is properly instructed as to an applicable legal principle it is unnecessary to restate that principle in another way. (*People* v. *Kelley*, 81 Cal.App. 398, 404 [253 P. 773]; *People* v. *Cravens, supra*, 79 Cal.App.2d 658, 668-669; *People* v. *Warner*, 134 Cal.App. 2d 829, 832 [286 P.2d 560].) Although a more specific instruction that honest intentions and good faith would be a good defense could well have been given we do not believe that such an instruction was necessary, in view of the instructions that were given. It is inconceivable that during the trial of two months duration the jury could have failed to understand that the defense of good faith was the precise one upon which the defendants relied.

A great deal of defendant's argument is that he was convicted not of making false statements but of making reckless statements, and of mere negligence. He says that throughout the trial the People sought to prove only the falsity of his statements and that recklessness was dwelt upon only in the final arguments and in the instructions. As we have stated, both defendant and the People requested the instruction which stated that a false pretense must be a false representation of an existing fact known to be untrue or a statement made recklessly and without information justifying a belief that it is true. Defendant says also that if he followed standard methods of procedure (presumably his own procedure) he could not have been guilty of negligence or recklessness, and that this was a question for experts in the use of the machines in question, none of whom were used as witnesses by the

whether or not the services were good or bad, beneficial or harmful is not the issue. The matter of guilt hinges on the good or bad intentions of the defendants. Good faith and honest intentions on the part of defendants constitute a complete defense to the charge of conspiracy, as contained in the indictment.''

People. The argument is untenable. Defendant represented that by his method he could detect cancer and tuberculosis and cure them and that he had done so in a great many cases. His statements were either true or false. He was no beginner. He was not relying upon what he had read or been told. He spoke from his own knowledge and experience. He was not mistaken because of misinformation. He knew, so he said, he could obtain certain results. That was the issue, and the jury found that he did not believe he had done in the past what he claimed to have done, and he did not believe he could do what he asserted, as a fact, he could do. We may add that we do not believe that upon the evidence the jury could reasonably have found any justification for the positive representations and assurances made to the patients who testified against him. The issue was clear cut and was well and fairly tried.

Defendant also argues that the court erred in refusing to give a number of instructions as to the scope of his chiropractic license. The proposed instructions would have told the jury that defendant was authorized to ". . . . use all necessary mechanical, and hygienic and sanitary measures incident to the care of the body" so long as he used no drugs in connection with his practice, and that ". . . a licensed chiropractor may lawfully treat a patient for cancer, or any other disease, within the limits of his chiropractic license. . . ." These instructions were not material to any issue in the case and were properly refused. Schmitt was not charged with using a mode of treatment which he was not authorized to use under his chiropractic license, and the fact that he may have been authorized to engage in the drugless treatment of cancer was wholly immaterial to the question whether he induced his patients to submit to his treatments through fraudulent misrepresentations.

As to the seventh point, there is no merit in the contention that one of the People's witnesses was guilty of prejudicial misconduct. During the cross-examination of Mrs. Spalliero, the witness was asked by defendant's counsel whether she had discussed Schmitt's treatments with Mrs. Reed and a certain attorney. Mrs. Spalliero replied that she did not talk the matter over with Mrs. Reed, but that a visiting nurse from the city health department "told me that he [Schmitt] was arrested a couple of times before," and that she (the witness) told Mrs. Reed about the statement and asked if it were true. Counsel promptly moved that the answer be

stricken on the grounds that it was hearsay and unresponsive; the court granted the motion and instructed the jury to disregard the answer.

In support of the claim of error, defendant argues that it was the district attorney's duty to anticipate and prevent the improper statement, citing *People* v. *Baker*, 147 Cal. App.2d 319 [305 P.2d 97]. The argument cannot be sustained. The case is not in point. The evidence improperly elicited by the district attorney in that case was such as he should have anticipated and warned the witness against. But such is not the case here. The incident occurred during defendant's cross-examination. The deputy could not reasonably have foreseen that Mrs. Spalliero would volunteer an improper statement while being questioned by defense counsel. Furthermore, the court immediately instructed the jury to disregard the answer and embodied its admonition to disregard stricken matter in a formal instruction at the conclusion of the trial. It is to be presumed that the jury followed these instructions and confined its deliberations to a consideration of matters which were properly in evidence. There is no substance to the assignment of error.

The next point raised on the appeal is that the district attorney committed prejudicial misconduct in making reference to the litigation between the United States of America and the Electronic Medical Foundation during his closing argument to the jury. Our attention is directed to the following remarks of the prosecutor: ''Let's come out and say this is an agreement between these two defendants whom we are only faced with, of whom we must only consider that this agreement was one of a conspiracy to get money, to get money as the result of representations that were recklessly made, without a justification for believing in them, and then those people that are out there [i.e., other persons using the radioscope and oscilloclast], they are not going to say 'Give me your money. This box will tell you what you've got,' *they are going to have to put up just like in San Francisco in the face of this injunction of the Federal Government. . . .*''

Counsel for defendant cited the italicized language as misconduct and requested that it be stricken upon the grounds that the statement was untrue and was not proper rebuttal argument. The deputy stated: ''They put good faith in here, in their argument,'' which counsel conceded. The court then admonished the jury to disregard the prosecutor's statement and added: ''I believe the testimony did not show an injunc-

tion, that there was a consent decree pending the lawsuit that the merchandise wouldn't be shipped out of the state, or something to that effect, so the fact that reference is made to an injunction may be misleading. . . .'' The deputy then said to the jurors: ''When the judge tells you to disregard something I say, that is to be done without any equivocation. If what I do has been wrong, I apologize to the Court and counsel, and to the defendants and to you. I do not seek to take unfair advantage of anyone anywhere. . . .''

Defendant urges that the reference by the prosecutor to the San Francisco litigation constituted misconduct of so serious a nature that its prejudical effect was not cured by the court's admonition. In support of the claim of prejudice, he points out that on the morning of the second day of its deliberations, the jurors requested additional instructions as to the meaning of a unanimous verdict and asked to have the transcript of Alvord's testimony read to them. Several jurors asked to hear her testimony about her knowledge of the lawsuit. This testimony was read to the jury at 1:30 p. m. and at 4:30 the same afternoon the jury returned its verdict.

While we have heretofore referred to the temporary injunction issued in the case of the government against the Electronic Medical Foundation, which uses the radioscope and oscilloclast, and to the questioning of Doctors Alford and Schmitt as to their knowledge of the litigation, little is said in the briefs with respect to the propriety of referring to the litigation at all. This is for the reason that defendant does not now contend that reference to the decree in the cross-examination of the doctors was reversible error, and the further reason that the defense introduced the decree into evidence. On behalf of the defendants in the government's litigation consent was given to the issuance of a temporary injunction. It enjoined against the transportation in interstate commerce of certain things, among them the radioscope and the oscilloclast if they were misbranded. It is sufficient to say of the injunction that it would have been violated by the transportation of a radioscope or an oscilloclast branded or labeled as intended for use in the treatment of cancer, tuberculosis or any other disease.

We cannot agree that the prosecutor was guilty of misconduct. The court had ruled that cross-examination of Doctors Alvord and Schmitt as to their knowledge of the decree was proper because it had some bearing upon their motives. In their testimony they admitted their knowledge

and their indifference to the government's litigation. Comment upon their attitude was not improper. If the prosecutor misstated the purport of the decree at one time we find that he twice stated that it was entered without prejudice to those who had consented to it and that the government was only seeking an injunction. The decree had been placed in evidence by the defense and spoke for itself. The remarks of the prosecutor implied that the decree forbade use of the machines, and while this was not the case, we believe the inaccuracy was inadvertent and that the fact that the decree was before the jury, the admonition and remarks of the court and the attitude of the prosecutor rendered harmless the statement complained of.

We must say that we believe all evidence relating to the injunction should have been excluded. Perhaps it had some remote bearing upon the motives of the defendants in continuing to use the machines, but we cannot see that it was deserving of more than passing consideration for that purpose. Moreover we doubt that the prosecution in bringing the decree to the attention of the jury had a single purpose in mind. The fact that the decree enjoined against the transportation in interstate commerce of the radioscope and oscilloclast and other devices branded or labeled as intended for the detection or treatment of disease was, in effect, a denunciation by the government of the use of the machines, which would naturally have made a strong impression upon the minds of the jurors. ▆▆▆ The fact that evidence may have some slight value upon one factual issue does not justify its admission if its inevitable tendency is to do serious harm to an adversary. ▆▆▆ But if there was harm it came from having the decree in evidence for the jury to read and not from the statements of the prosecutor.

▆▆▆ A judgment will not be reversed for improper remarks of a prosecutor, not made in bad faith, when there is a prompt admonition by the court and it appears that no prejudice has resulted. (*People* v. *Willard,* 150 Cal. 543, 552 [89 P. 124]; *People* v. *Craig,* 152 Cal. 42, 50 [91 P. 997]; *People* v. *Montgomery,* 47 Cal.App.2d 1, 20 [117 P.2d 437].)

One other point remains to be considered. In support of the motion for a new trial, Schmitt's counsel filed an affidavit in which he alleged that following the discharge of the jury, two jurors asked him whether he was going to Texas to defend a Mr. Hoxsey, the founder of the Hoxsey cancer treatment. Attached to the affidavit were copies of newspaper

stories which appeared in the local press during the trial; the stories concerned the condemnation of Hoxsey's cancer cure by the United States Government. Defendant argues that the jurors were improperly influenced by these articles in arriving at their verdict. There was no evidence that such was the case. ▮ Moreover, it is well settled that the verdict of a jury may not be impeached by the affidavits of third persons which set forth the substance of extrajudicial statements of jurors. (*People* v. *Cahan*, 141 Cal.App.2d 891, 902-03 [297 P.2d 715].) ▮ Furthermore, the newspaper articles are matters outside the record and will not be considered on the appeal. (*People* v. *Ruiz*, 103 Cal.App.2d 146, 149-50 [229 P.2d 73], and cases cited.)

After giving full consideration to the many claims of error in the trial we have found no disregard of defendant's right to a fair trial.

The judgment and the order appealed from are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied December 2, 1957, and appellant's petition for a hearing by the Supreme Court was denied December 30, 1957.